# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 09-CV-100-RET-CN |
| | ) |
| LOUISIANA GENERATING LLC, | ) |
| | ) |
| Defendant. | ) |

_____)


## LOUISIANA GENERATING LLC'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (NUMBER THREE): MOTION FOR SUMMARY JUDGMENT ON THE PROPER LEGAL STANDARD FOR RMRR

**Table of Contents**

I. INTRODUCTION ................................................................................................ 1

II. STATUTORY AND REGULATORY BACKGROUND ..................................... 4

   A. The New Source Review Programs Under The CAA. ................................ 4

   B. EPA's Historical Interpretation Of RMRR. .............................................. 7

   C. EPA Seeks To Retroactively Change The RMRR Standards Through Litigation. .......... 10

III. STANDARD OF REVIEW ............................................................................... 10

IV. FACTUAL BACKGROUND ............................................................................ 11

V. ARGUMENT ...................................................................................................... 12

   A. Most Courts Have Adopted The "Routine In The Industry" Standard ........................... 13

      1. The Seventh Circuit's *WEPCo* opinion. ...................................... 14

      2. The *Duke Energy* opinions ......................................................... 15

      3. The *Alabama Power* opinions ..................................................... 17

      4. The *East Kentucky Power Cooperative* opinion. ......................... 19

      5. The *Allegheny* opinion. .............................................................. 20

      6. The *TVA* opinions. ...................................................................... 21

   B. A Minority Of Courts Have Adopted A Form Of The "Routine At The Unit" Standard. ........... 22

   C. EPA's Attempt To Impose A Narrower RMRR Standard Through Litigation Is Unlawful. .......... 24

VI. CONCLUSION ................................................................................................. 26

Case 3:09-cv-00100-JJB-DLD   Document 140-1   02/04/11   Page 2 of 34

**Table of Authorities**

CASES                                                                    PAGE(S)

*Alabama Power Co. v. Costle*,
 636 F.2d 323 (D.C. Cir. 1979) ...................................................................5

*Alaska Dep't. of Envtl. Conserv. v. Envtl. Prot. Agency*,
 540 U.S. 461 (2004)..............................................................................18

*Alaska Prof'l Hunters Ass'n v. FAA*,
 177 F.3d 1030 (D.C. Cir. 1999) ..............................................................25

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986)..............................................................................10

*Appalachian Power Co. v. EPA*,
 208 F.3d 1015 (D.C. Cir. 2000) ..............................................................25

*Buzek v. Pepsi Bottling Grp., Inc.*,
 501 F. Supp. 2d 876 (S.D. Tex. 2007) ......................................................11

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986)..............................................................................10

*Edwards v. Aguillard*,
 482 U.S. 578 (1987)..............................................................................11

*Essex Chem. Corp. v. Ruckelshaus*,
 486 F.2d 427 (D.C. Cir. 1973) ..................................................................4

*National Parks Conservation Association v. TVA ("TVA I")*,
 618 F. Supp. 2d 815 (E.D. Tenn. 2009)..............................................21, 22

*National Parks Conservation Association v. TVA ("TVA II")*,
 No. 3:01-CV-71, 2010 WL 1291335 (E.D. Tenn. Mar. 31, 2010) .........................22

*New York v. Am. Elec. Power Serv. Corp.*,
 No. 2:04-cv-1098, 2:05-cv-360, 2007 WL 539536 (S.D. Ohio Feb. 15, 2007)......................23

*Pa. Dep't of Envtl. Prot. v. Allegheny Energy, Inc.*,
 Civil Action No. 05-0885, 2010 WL 1541457 (W.D. Pa. Apr. 18, 2010)..............................21

*Pa. Dep't of Envtl. Prot. v. Allegheny Energy, Inc.*,
 No. 02:05cv885, 2008 WL 4960090 (W.D. Pa. Nov. 18, 2008) .......................................20, 21

Case 3:09-cv-00100-JJB-DLD   Document 140-1   02/04/11   Page 3 of 34

*Paralyzed Veterans of Am. v. D.C. Arena*,
    117 F.3d 579 (D.C. Cir. 1997) ........................................................................25

*Pennsylvania Dep't. of Envtl. Prot. v. Allegheny Energy, Inc.*,
    No. 05-885, 2008 WL 4960100 (W.D. Pa. Sept. 2, 2008)....................14, 20, 21, 24

*Shell Offshore Inc. v. Babbitt*,
    238 F.3d 622 (5th Cir. 2001) ........................................................................25

*Sierra Club v. Morgan*,
    No. 07-C-251-S, 2007 WL 3287850 (W.D. Wis. Nov. 7, 2007)...........................23

*Syncor Int'l Corp. v. Shalala*,
    127 F.3d 90 (D.C. Cir. 1997) ........................................................................25

*TVA v. Whitman*,
    278 F.3d 1184 (11th Cir. 2002), *opinion withdrawn in part*, 336 F.3d 1236 (11th Cir.
    2003) ......................................................................................................12

*United States v. Alabama Power Co.* ("*Alabama Power I*"),
    372 F. Supp. 2d 1283 (N.D. Ala. 2005)................................................17, 18, 19, 23

*United States v. Alabama Power Co.* ("*Alabama Power II*"),
    681 F. Supp. 2d 1292 (N.D. Ala. 2008) ..........................................................19

*United States v. Cinergy*,
    495 F. Supp. 2d 909 (S.D. Ind. 2007) ........................................................23, 24

*United States v. Duke Energy Corp.* ("*Duke Energy I*"),
    278 F. Supp. 2d 619 (M.D.N.C. 2003) ........................................15, 16, 17, 24, 25

*United States v. Duke Energy Corp.* ("*Duke Energy II*"),
    411 F.3d 539 (4th Cir. 2005) ........................................................................15

*United States v. Duke Energy Corp.* ("*Duke Energy III*"),
    549 U.S. 561 (2007).................................................................................15, 17

*United States v. Duke Energy Corp.* ("*Duke Energy IV*"),
    No. 1:00CV1262, 2010 WL 3023517 (M.D.N.C. July 28, 2010)…….. .............14, 15, 16, 17

*United States v. East Kentucky Power Cooperative, Inc.* ("*EKPC*"),
    498 F. Supp. 2d 976 (E.D. Ky. 2007) ..........................................................19, 20

*United States v. Mead Corp.*,
    533 U.S. 218 (2001)....................................................................................17, 18

*United States v. Ohio Edison*,
    276 F. Supp. 2d 829 (S.D. Ohio 2003) ........................................................22, 24

Case 3:09-cv-00100-JJB-DLD   Document 140-1   02/04/11   Page 4 of 34

*United States v. Southern Ind. Gas and Elec.*,
    245 F. Supp. 2d 994 (S.D. Ind. 2003) ("SIGECO") ..............................................23, 24

*Wisconsin Elec. Power Co. v. Reilly* ("WEPCo"),
    893 F.2d 901 (7th Cir. 1990) ..............................................8, 12, 14, 15

## FEDERAL STATUTES AND REGULATIONS

5 U.S.C. § 553 ..............................................25

42 U.S.C. §§ 7401 *et seq.* ..............................................2

42 U.S.C. § 7409 ..............................................4

42 U.S.C. § 7410 ..............................................4, 6

42 U.S.C. § 7411 ..............................................4, 5

42 U.S.C. § 7479 ..............................................6, 13

42 U.S.C. § 7501 ..............................................5

42 U.S.C. § 7607 ..............................................25

40 C.F.R. Part 52 ..............................................2, 6

40 C.F.R. § 60.2(h) ..............................................5

40 C.F.R. § 60.14(e)(1) (1976) ..............................................5

36 Fed. Reg. 24,876 (Dec. 23, 1971) ..............................................5

39 Fed. Reg. 36,946 (Oct. 15, 1974) ..............................................5

40 Fed. Reg. 58,416 (Dec. 16, 1975) ..............................................5

52 Fed. Reg. 13,671 (Apr. 24, 1987) ..............................................6

57 Fed. Reg. 32,314 (July 21, 1992) ..............................................2, 6, 9, 13, 21

## STATE REGULATIONS

La. ADMIN. CODE tit. 33, § 509 ..............................................2, 6, 13

Case 3:09-cv-00100-JJB-DLD   Document 140-1   02/04/11   Page 5 of 34

Louisiana Generating LLC ("LaGen") respectfully submits this Memorandum in Support of its Motion for Summary Judgment requesting a legal ruling that the proper standard to be applied by the trier of fact in this case under the "routine, maintenance, repair and replacement" ("RMRR") exclusion to the Prevention of Significant Deterioration ("PSD") rules is the "routine in the industry" standard. That "routine in the industry" standard assesses the "routineness" of a project or, in fact, any work, by looking not only to the individual electric generating unit at issue, but also to the electric utility industry as a whole.

Concurrently with this Motion, LaGen has filed a Motion for Summary Judgment on Plaintiffs' PSD claims set forth in Counts 1 and 3 of their respective complaints.[1] If that motion for summary judgment is granted, it would dispose of Plaintiffs' PSD claims (and, indeed, all of Plaintiffs' claims in this case) in their entirety, thereby obviating the need for a trial and rendering this Motion on the proper RMRR standard moot.

## I.     INTRODUCTION

The PSD program, enacted by Congress in the 1977 Amendments to the Clean Air Act ("CAA"), applies on a pollutant-by-pollutant basis to new sources located in areas, such as Point Coupee Parish, that are in attainment with certain air quality standards set by the Environmental Protection Agency ("EPA"). The Louisiana Department of Environmental Quality ("LDEQ") acting as the duly authorized permitting authority, administers, implements, and enforces the PSD program in Louisiana.[2] The PSD provisions apply only when a new emitting source is built

---

[1] *See* LaGen's Motion for Summary Judgment (Number One): Motion for Summary Judgment on Plaintiffs' PSD Claims (filed 2/4/11).

[2] Except where it is necessary to distinguish between EPA and LDEQ, this brief refers to the two parties, collectively, as Plaintiffs. Further, because the Complaints filed by EPA and LDEQ are nearly identical, this brief includes citations solely to the EPA Complaint, except where indicated.

Case 3:09-cv-00100-JJB-DLD   Document 140-1   02/04/11   Page 6 of 34

or when a "major modification" is constructed to an existing major stationary source. *See* Louisiana Administrative Code ("LA. ADMIN. CODE") tit. 33, § 509.I (attached hereto as Exhibit A). However, as EPA has recognized, Congress "did not intend to make every activity at a source subject to new source requirements." 57 Fed. Reg. 32,314, 32,316 (July 21, 1992) (attached hereto as Exhibit B). Consistent with that understanding, the federal and Louisiana PSD regulations exclude numerous activities from the PSD program, including "routine maintenance, repair and replacement" activities at an existing facility, 40 C.F.R. § 52.21(b)(2)(iii)(a), LA. ADMIN. CODE tit. 33, § 509. (Ex. A).

This case is one in a long series of cases, initiated in 1999, in which EPA is using litigation to shift fundamentally how the CAA regulates existing sources of emissions. In this action, EPA and LDEQ seek to apply retroactively a different interpretation of the RMRR exclusion to two projects that Cajun Electric Power Cooperative, Inc. ("Cajun Electric") — not LaGen — performed in 1998 and 1999 at the Big Cajun II electric generating station ("BCII") in New Roads, Louisiana. EPA's retroactive action is unlawful.

The CAA, 42 U.S.C. §§ 7401 *et seq.*, distinguishes between existing sources and new or modified sources of emissions. Under the CAA, the states set emissions limits for *existing* sources to meet nationally applicable air quality standards. In addition, technology-based limitations apply to *new* emissions sources, which include newly-constructed sources or "modifications" of existing sources. For 30 years, EPA interpreted and applied the CAA so as to preserve the distinction between regulating existing sources of emissions and new sources of emissions. During that time, Cajun Electric, like every other utility in the country, repaired or replaced components on its electric generating units as needed to maintain the availability, reliability and safety of the equipment. This work was undertaken in full view of the EPA and

2

state environmental agencies. Indeed, all of the interested players — the utilities, the states and the EPA — understood full well that this normal replacement or repair of components did not constitute "modifications" under the PSD program because PSD does not apply to RMRR — *i.e.*, maintenance, repair and replacement activities that are routine within the electric utility industry.

However, in late 1999, without regard to appropriate notice and comment procedures, EPA fundamentally changed its long-standing interpretation of the RMRR standards. EPA launched its so-called "electric utility enforcement initiative," seeking to narrow the scope of RMRR from focusing on projects that are routine *within the industry* to focusing on projects that are routine for the *unit at issue*. As determined by the majority of courts to have considered the RMRR issue, EPA's unit-based interpretation is inconsistent with EPA's long-standing and contemporaneous interpretations of the RMRR rules. EPA cannot, by retroactive enforcement and without notice-and-comment rulemaking, change its interpretation of the agency's regulations through litigation.

Accordingly, LaGen moves for summary judgment to set the proper legal standard for RMRR to be applied to the PSD claims in this case — a standard that assesses the routineness of the projects at issue by looking not only to what is routine at BCII, but also to what is routine in the electric utility industry as a whole. As noted above, this Motion will be rendered moot if this Court grants LaGen's Motion for Summary Judgment on Plaintiffs' PSD Claims. However, in the event this case proceeds to trial, then the resolution of this Motion on the proper legal standard for RMRR will narrow this dispute and help frame the issues for trial.

Case 3:09-cv-00100-JJB-DLD   Document 140-1   02/04/11   Page 8 of 34

## II.    STATUTORY AND REGULATORY BACKGROUND

### A.    The New Source Review Programs Under The CAA.

In its amendments to the CAA over nearly four decades, Congress repeatedly chose not to require existing emissions sources to be retrofitted across the board with advanced pollution control technology.  Instead, Congress chose to regulate existing emissions sources only as necessary to meet national air quality standards developed by EPA and implemented by the states.  Congress enacted the New Source Review ("NSR") programs to evaluate and minimize the impact of additions of new emissions capacity.

In 1970, Congress directed EPA to develop National Ambient Air Quality Standards ("NAAQS") to protect the nation's public health and welfare with an adequate margin of safety. 42 U.S.C. § 7409.  The states, in turn, were to develop State Implementation Plans ("SIPs"), setting source-by-source emissions limits to meet the NAAQS.  *Id*. § 7410.  The 1970 Amendments also directed EPA to issue New Source Performance Standards ("NSPS") to minimize the environmental impact of adding new emissions capacity.[3]  Congress debated whether to subject existing emissions capacity to NSPS, but chose not to do so.[4]  Thus, NSPS apply only to new sources of emissions — *i.e.*, newly-constructed emission units or "modifications" of existing units.  *Id*. § 7411(a)(2) (defining "new source" as one on which "construction or modification . . . is commenced after" a given date).  Congress defined "modification" as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in

---

[3]  "The legislative history of § 111 [NSPS] . . . reveals that Congress was most concerned that new plants — new sources of pollution — would have to be controlled to the greatest degree practicable if the national goal of a cleaner environment was to be achieved."  *Essex Chem. Corp. v. Ruckelshaus*, 486 F.2d 427, 434 n.14 (D.C. Cir. 1973).

[4]  *See* S. Rep. No. 91-1196 (1970), *reprinted* in Legal Compilation: Statutes and Legislative History, EPA (1973) (attached hereto as Exhibit C).

4

the emission of any air pollutant not previously emitted." *Id*. § 7411 (a)(4) (emphasis added). In 1971, EPA promulgated rules in response to the 1970 CAA Amendments, including a regulatory definition of "modification" that tracked the statutory definition almost verbatim. *See* 36 Fed. Reg. 24,876 (Dec. 23, 1971) (attached hereto as Exhibit D).[5] These rules specified that "[r]outine maintenance, repair, and replacement shall not be considered physical changes." *Id*. at 24,877 (codifying 40 C.F.R. § 60.2(h)). In 1974, EPA proposed revised NSPS rules to clarify "the intent of section 111 of controlling facilities only when they constitute a new source of emission." 39 Fed. Reg. 36,946 (Oct. 15, 1974) (attached hereto as Exhibit E). In the final rule, EPA specified that a modification shall not include "maintenance, repair or replacement" projects that are "routine for *a source category*." 40 C.F.R. § 60.14(e)(1) (1976) (attached hereto as Exhibit F); 40 Fed. Reg. 58,416, 58,419 (Dec. 16, 1975) (emphasis added) (attached hereto as Exhibit G).

In 1977, Congress further amended the CAA by enacting two new programs — the PSD program and the companion Non-Attainment New Source Review ("NNSR") program. In doing so, Congress specifically considered the various provisions of the regulatory program and decided to "tighten[]" some of them. *See Alabama Power Co v. Costle*, 636 F.2d 323, 349-50 (D.C. Cir. 1979). Congress defined "modification" under NNSR to "mean the same as the term 'modification' as used in section 7411(a)(4) [NSPS]." 42 U.S.C. § 7501(4). As originally enacted, the PSD program referred only to the "construction" of major stationary sources, and not to "modification" as did the NNSR program. Three months later, Congress fixed this oversight by adding "modification" as defined under NSPS to the "construction" activity

---

[5] The authenticity of the exhibits attached to this Memorandum is verified in the Declaration of Megan Berge, which is attached hereto as Exhibit AA.

Case 3:09-cv-00100-JJB-DLD   Document 140-1   02/04/11   Page 10 of 34

potentially subject to PSD. *See id.* § 7479(2)(C) ("The term 'construction' . . . includes the modification (as defined in section 7411(a) [NSPS] . . . . ").

The final 1980 PSD rules defined "major modification" as "any physical [or operational] change . . . of a major stationary source that would result in a significant net emissions increase" in the source's "actual emissions," and retained the long-standing RMRR exclusion. *See* 40 C.F.R. § 52.21(b)(2)(iii)(a). Subsequently, in 1992, EPA confirmed that, like the RMRR exclusion under NSPS, the RMRR exclusion under PSD covers projects that are "routine *for a source category*":

> the determination of whether the repair or replacement of a particular item of equipment is "routine" under the NSR regulations, while made on a case-by-case basis, must be based on the evaluation of *whether that type of equipment has been repaired or replaced by sources within the relevant industrial category.*

57 Fed. Reg. 32,314, 32,326 (July 21, 1992) ("WEPCo Rule") (emphasis added). (Ex. B).

Each state is required to adopt and submit to the EPA for approval a SIP that includes regulations implementing the PSD requirements noted above. 42 U.S.C. § 7410. Louisiana has an EPA approved SIP as referenced in 40 C.F.R. Part 52, Subpart T. EPA approved amendments to the Louisiana SIP on April 24, 1987, that delegated to LDEQ the authority for implementing the PSD permitting program. 52 Fed. Reg. 13,671 (Apr. 24, 1987) (attached hereto as Exhibit H). The Louisiana PSD regulations, which govern here, define "major modification" as "[a]ny physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under this Part." LA. ADMIN. CODE tit. 33, pt. III, § 509(B). Routine maintenance, repair and replacement performed on a stationary source is exempted from the Louisiana PSD regulations as it is from the federal regulations. *Id.*

B.  EPA's Historical Interpretation Of RMRR.

From the earliest days of the PSD program, the EPA made clear that the PSD requirements would not apply to the types of normal maintenance and replacement activities, like the projects at issue in this case, that had been ongoing for decades at coal-fired power plants across the country, including BCII. EPA's Assistant Administrator for Air and Radiation agreed that the definition of "modification" did not cover "activities at a plant which tend to extend the useful life of that plant or tend to increase the total emissions generated over the total life of that plant." *See* "Proceedings of the Acid Rain Conference, Apr. 8-9, 1980," by EPA's OAQPS (Aug. 1980) at 192 (attached hereto as Exhibit I). In 1987, EPA's Administrator told Congress that the NSR programs did not require the retrofit of pollution controls on pre-NSPS (*i.e.*, existing) coal-fired power plants and that EPA opposed proposed legislation that would mandate such unit-by-unit controls.[6]

In the 30-year history of NSR prior to EPA's enforcement initiative beginning in late 1999, there was only one instance in which EPA made a formal determination that a repair and replacement project at a power plant constituted a major modification triggering PSD requirements.[7] In 1988, Wisconsin Electric Power Company ("WEPCo") proposed a "renovation" project at its Port Washington Plant. The project exemplified the unusual circumstances under which work at an existing plant would be deemed a "modification" triggering PSD. Most notably, WEPCo proposed to replace the steam drums and plate-type air

---

[6] *See Acid Rain and Nonattainment Issues*, Hearing before the Subcomm. on Envtl. Protection of the Comm. on Env't and Public Works, 100th Congress (Apr. 22, 1987) (statement of Lee Thomas, Adm'r EPA) at 26-27. (Ex. J).

[7] *See* WEPCo NSR Applicability Determination, D. Clay memo, to D. Kee (Sept. 9, 1988) (the "Clay Memorandum") (attached hereto as Exhibit K); L. Thomas letter to J. Boston (Oct. 14, 1988) (the "Final WEPCo Determination") (attached hereto as Exhibit L); D. Clay letter to J. Boston (Feb. 15, 1989) (the "Revised WEPCo Determination") (attached hereto as Exhibit M).

heaters at the units. To assess whether the projects were "routine" for RMRR purposes, the EPA introduced a multi-part test, known today as the WEPCo test: "In determining whether proposed work at an existing facility is 'routine,' EPA makes a case-by-case determination by weighing the nature, extent, purpose, frequency, and cost of the work, as well as other relevant factors, to arrive at a common-sense finding." Clay Memorandum at 3 (Ex. K). Making a comparison to the electric utility industry at large, EPA "found no examples of steam drum replacement at aged electric generating facilities," and WEPCo was unable to provide examples of any replacement of plate-type air heaters similar to WEPCo's. Final WEPCo Determination at 4 (Ex. L); Revised WEPCo Determination at 7 (Ex. M). Given the apparent unprecedented nature of the WEPCo projects, EPA concluded it was not RMRR. The U.S. Court of Appeals for the Seventh Circuit subsequently affirmed EPA's conclusion regarding the RMRR issue. *See Wisconsin Elec. Power Co. v. Reilly ("WEPCo")*, 893 F.2d 901 (7th Cir. 1990).

After *WEPCo*, EPA reaffirmed that repair and replacement projects common within the electric utility industry would not trigger PSD. For example, a 1990 General Accounting Office report (the "GAO Report") commissioned by Congress concluded that "EPA officials do not consider WEPCo's project typical of most utility life extension projects, and they expect that the ruling will not significantly affect utilities' decisions to undertake power plant life extension projects." *See* "Electric Supply: Older Plants' Impact on Reliability and Air Quality," GAO Report to the Chairman, Subcomm. on Energy and Commerce, U.S. House of Reps. (Sept. 1990) at 29 ("GAO Report") (attached hereto as Exhibit N); *id*. at 31 ("Lending evidence to the officials' statements, EPA's 1989 emission forecast assumed that the WEPCo decision would not result in a significant number of additional power plants having to comply with the NSPS and the PSD program requirements.").

It is undisputed that senior EPA officials were fully aware of, *and agreed with*, the GAO's conclusions, both before the GAO Report was issued (as indicated in the Report itself) and after it was issued.[8] Chairman Dingell formally transmitted the GAO Report to EPA and asked the Administrator again about *WEPCo* and the GAO Report's assessment. *See* J. Dingell letter to J. Watkins (Oct. 9, 1990) (attached hereto as Exhibit O). Assistant EPA Administrator William Rosenberg responded for EPA, stating that "[a]s indicated in the GAO report, it is expected that *most* utility projects will *not* be similar to the WEPCo situation" and that "the [*WEPCo*] ruling is not expected to significantly affect power plant life extension projects." W. Rosenberg letter to J. Dingell at 5-6 (June 19, 1991) (attached hereto as Exhibit P) (first emphasis added; second emphasis in original).

The EPA's subsequent issuance of the WEPCo Rule in 1992 further confirmed that "determination of whether the repair or replacement of a particular item of equipment is 'routine' . . . *must* be based on the evaluation of whether that type of equipment has been repaired or replaced *by sources within the relevant industrial category*." WEPCo Rule, 57 Fed. Reg. at 32,326 (July 21, 1992) (emphasis added). (Ex. B). Subsequently, in 1995, EPA's Assistant Administrator for Air and Radiation advised the electric utilities industry that "EPA believes that the routine maintenance exclusion already included in the existing NSR regulations . . . has the effect of excluding 'routine restorations'" from the requirements of the NSR programs. *See* "Response to Issues Raised by Industry on Clean Air Act Implementation Reform," *attached* to M. Nichols letter to W. Lewis (May 31, 1995), at 19 (attached hereto as Exhibit Q).

---

[8] Before the GAO Report was issued, GAO sent EPA a fact sheet listing most of the information to be included in the Report and requested comments from EPA. *See* S. Tiber mem. to N. Kete (Apr. 10, 1990), attaching GAO Fact Sheet, "Utility Decisionmaking for Aging Powerplants" (attached hereto as Exhibit R). The fact sheet was distributed widely at EPA. *See id.* (listing eight additional recipients to the three main recipients).

Case 3:09-cv-00100-JJB-DLD    Document 140-1    02/04/11    Page 14 of 34

C.    EPA Seeks To Retroactively Change The RMRR Standards Through Litigation.

Starting in late 1999, EPA abruptly reversed course.  In an action the agency itself admitted was "unprecedented," EPA commenced its utility enforcement initiative by filing lawsuits alleging PSD violations against eight coal-fired utilities, and an administrative action against the Tennessee Valley Authority, the federal government's own electric utility.[9]  Since then, as part of the enforcement initiative, EPA has filed actions against other utilities, including this action against LaGen.  Each complaint in the enforcement initiative is based upon the incorrect narrowed interpretation of RMRR that defines the concept of "routineness" relative to the unit at issue.  If EPA's litigating position is correct, then every owner of an electric generating unit effectively engaged in blatant violations of the CAA for decades, and EPA and all fifty States were asleep at the wheel.

III.    STANDARD OF REVIEW

Summary judgment must be granted against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact," but need not *negate* the elements of the nonmovant's case.  *Id*. at 323.  Once the movant has satisfied this initial showing, the burden shifts to the nonmoving party to set forth specific facts showing there is a genuine issue for trial and that a trier of fact could reasonably find in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Summary judgment may be particularly appropriate when the questions to be decided are issues of law, such as

---

[9]  EPA Press Release, "U.S. Sues Electric Utilities in Unprecedented Action to Enforce the Clean Air Act" (Nov. 3, 1999) (attached hereto as Exhibit S), *available at* http://yosemite.epa.gov/opa/admpress.nsf/0/f69299d8fc24d86d8525681e00067445e ?QpenDocument.

statutory interpretation. *Buzek v. Pepsi Bottling Grp., Inc.*, 501 F. Supp. 2d 876, 878 (S.D. Tex. 2007) (citing *Edwards v. Aguillard*, 482 U.S. 578, 595-96 (1987)).

## IV.    FACTUAL BACKGROUND

The present Motion seeks only a determination by the Court of the legal standard to be applied by the trier of fact in this case to the parties' competing evidence regarding the RMRR exclusion. Although it is not essential to resolving the purely legal issue of the proper RMRR standard, LaGen provides the following factual background, which is based entirely on Plaintiffs' own allegations, solely to help frame the overall dispute.

BCII is a coal-fired electric steam generating power plant consisting of three units, two of which (Units 1 and 2) are at issue here, generating electricity for power cooperatives serving homes and businesses in Louisiana. BCII Units 1 and 2 were initially permitted in 1976, but began operations in or around 1981. EPA Compl. ¶ 31. Cajun Electric was the original owner of Units 1 and 2 and owned and operated those units through March 31, 2000. *Id*. ¶ 43. In 1994, Cajun Electric filed a Chapter 11 petition for bankruptcy in the U.S. Bankruptcy Court for the Middle District of Louisiana ("Bankruptcy Court"). *Id*. ¶ 32. On October 14, 1999, the Bankruptcy Court confirmed Cajun Electric's plan of reorganization and approved the sale of certain of Cajun Electric's assets to LaGen, including BCII Units 1 and 2. *Id*. ¶¶ 39-40. On April 1, 2000, LaGen became the owner and operator of BCII Units 1 and 2. *Id*. ¶ 43.

In the fall of 1998, prior to LaGen's purchase of the BCII units at issue, Cajun Electric replaced the primary reheater in the boiler at BCII Unit 1 with pre-fabricated tube bundles. *See* EPA Compl. ¶ 34. In the spring of 1999, Cajun Electric replaced the primary reheater in the boiler at BCII Unit 2 with pre-fabricated tube bundles. *See id.* ¶ 36. Cajun Electric did not obtain PSD permits before undertaking the project. *Id*. ¶¶ 49, 61.

11

Plaintiffs allege that Cajun Electric's two primary reheater replacement projects were "major modifications" under the PSD provisions of the CAA, and that Cajun Electric violated the CAA by failing to obtain preconstruction PSD permits. LaGen contends, among other challenges to Plaintiffs' allegations, that the reheater replacement projects were routine within the electric generating industry and thus, under the RMRR exclusion, did not require PSD permitting prior to construction by Cajun Electric.

## V. ARGUMENT

For the RMRR analysis, the parties agree that the Court should apply the *WEPCo* multi-factor test — considering (1) the project's nature and extent; (2) its purpose; (3) its frequency; and (4) its cost — and that no single factor is dispositive. *See WEPCo*, 893 F.2d at 910. However, the parties disagree as to the proper standard for determining "routineness." As framed by the Eleventh Circuit, "[a] central disagreement between [the utility industry] and EPA is whether 'routine' should be defined relative to an industrial category or to a particular unit." *TVA v. Whitman*, 278 F.3d 1184, 1189 n.3 (11th Cir. 2002), *opinion withdrawn in part*, 336 F.3d 1236 (11th Cir. 2003). To date, no appellate court has resolved that dispute. Nor has EPA provided any definition of "routine" in a promulgated regulation. As a result, it falls to this Court to decide which potential interpretation of the RMRR exclusion applies in this case — (i) the "routine in the industry" standard published by EPA in the *Federal Register* and adopted by the majority of district courts to have considered the issue, or (ii) the "routine at the unit" standard urged by EPA in this litigation.

The fact that RMRR should be assessed on an "industry" standard is made clear by the structure of the PSD provisions themselves, which are predicated on an industry category approach. The Louisiana rules define PSD applicability according to categories of "[m]ajor

stationary sources" established by the regulations. LA. ADMIN. CODE tit. 33, pt. III, § 509(B). (Ex. A). Similarly, Congress defined the scope of the PSD program in the CAA in terms of source categories. 42 U.S.C. § 7479(1).

Until EPA began its enforcement initiative in 1999, EPA was consistent in its use of a source category or industry category metric for determining what maintenance, repair and replacement activities were "routine." During the EPA rulemaking in which EPA clarified how NSR should be applied to existing power plants following *WEPCo*, EPA specifically addressed how the RMRR exclusion should be applied:

> EPA is today clarifying that the determination of whether the repair or replacement of a particular item of equipment is "routine" under the NSR regulations, while made on a case-by-case basis, must be based on the evaluation of *whether that type of equipment has been repaired or replaced by sources within the relevant industrial category.*

57 Fed. Reg. 32,314, 32,326 (July 21,1992) (emphasis added). (Ex. B). As the majority of courts considering the issue have recognized, that statement (and others) by EPA was clear and unequivocal, and EPA should be bound by it having never modified or revoked it.

A.    Most Courts Have Adopted The "Routine In The Industry" Standard.

The great weight of authority — including the most recent district court decisions on the issue — have adopted the "routine in the industry" standard as the proper standard for determining "routineness" under the RMRR exclusion. Five U.S. District Courts — the Eastern District of Tennessee, Middle District of North Carolina, Western District of Pennsylvania, Northern District of Alabama, and Eastern District of Kentucky — have expressly adopted a version of the "routine in the industry standard" over the EPA's more narrow unit-based standard. Moreover, while not expressly articulating an industry standard, the only Circuit Court of Appeals to have addressed the issue, the Seventh Circuit in *WEPCo*, unquestionably assessed

Case 3:09-cv-00100-JJB-DLD   Document 140-1   02/04/11   Page 18 of 34

the project at issue by comparing it to *other projects in the utility industry*. A review of this authority strongly supports adopting the "routine in the industry" standard in this case.

      1.    <u>The Seventh Circuit's *WEPCo* opinion.</u>

    In *WEPCo*, the Seventh Circuit described the proposed Port Washington project as a "highly unusual, if not unprecedented, and costly project." 893 F.2d at 911 (citing Clay Memorandum at 4). Significant to the legal issue presented by this Motion, in considering the RMRR issue in *WEPCo*, the Seventh Circuit assessed the project by looking at the utility *industry* as a whole: "WEPCo did not identify, and EPA did not find, even a single instance of renovation work at any electric utility generating station that approached the Port Washington life extension project in nature, scope or extent." *Id*.

    Regarding the proper standard for the RMRR exclusion, one district court recently described the significance of *WEPCo* as follows:

> In the applicability determination, as well as in the appeal to the Seventh Circuit, the EPA compared the proposed projects at the Port Washington facility to projects undertaken at other electric utility facilities to show that the Port Washington projects were not "routine." By making these comparisons in the *WEPCo* case, the EPA, (and the Seventh Circuit in affirming the EPA's decision), confirmed the relevance of industry practice in the RMRR analysis.

*United States v. Duke Energy Corp. ("Duke Energy IV")*, No. 1:00CV1262, 2010 WL 3023517, at * 3 (M.D.N.C. July 28, 2010) (attached hereto as Exhibit T) (citing *WEPCo*, 893 F.2d at 911); *see also Pennsylvania Dep't. of Envtl. Prot. v. Allegheny Energy, Inc.*, No. 05-885, 2008 WL 4960100, at * 4 (W.D. Pa. Sept. 2, 2008) (attached hereto as Exhibit U) ("[T]he [Seventh Circuit] conducted its RMRR analysis with an eye toward whether the project before it was 'routine in the industry', taking its lead from the EPA." (citing *WEPCo* at 911-12)). Thus, under *WEPCo*, the only Circuit Court opinion to have addressed the RMRR standard, it is clear that the test considers routineness in the *industry*.

Case 3:09-cv-00100-JJB-DLD   Document 140-1   02/04/11   Page 19 of 34

2.      The *Duke Energy* opinions.

In the initial *Duke Energy* opinion, the district court held that the RMRR exclusion must be analyzed using the WEPCo multi-factor test applied in reference to the source or industry category. *See United States v. Duke Energy Corp. ("Duke Energy I")*, 278 F. Supp. 2d 619, 631 (M.D.N.C. 2003).[10]  In making that ruling, the *Duke Energy I* court observed that EPA itself had used an industry-focused approach in its WEPCo applicability determination:

> For example, in the [September 1988] Clay Memorandum, the EPA stated that the "work called for under the project was rarely, if ever, performed." . . . This conclusion was confirmed by WEPCO which stated: "Generally, the renovation work items included in this application are those that would normally occur only once or twice during a unit's expected life cycle." . . . If the relevant inquiry under the RMRR exemption is whether a particular activity is "routinely performed at an individual unit" as the EPA now asserts, the EPA in *WEPCO* could have simply concluded its RMRR inquiry with the admission by WEPCO that the proposed project would occur only once or twice during a unit's expected life cycle.

> The EPA, however, requested that WEPCO "submit information regarding the frequency of replacement of steam drums." . . . [T]he EPA distinguished several of the projects [submitted by WEPCO] from WEPCO's project primarily on the ground that they did not involve utility boilers, *i.e.*, they were not in the same source category. . . . The fact that no other utilities replaced steam drums can be relevant only if the appropriate inquiry is what is routine within the industry.

*Duke Energy I*, 278 F. Supp. 2d at 633-34.

_____

[10]  Although *Duke Energy* has a somewhat lengthy and complex procedural history, its resolution of the RMRR issue was relatively straight-forward.  Based on the legal rulings in *Duke Energy I*, which included a ruling on the proper emissions test, the parties submitted joint stipulations to the district court that eliminated the need for a trial, and the district court entered final judgment for Duke based on the joint stipulations.  *See Duke Energy IV*, No. 1:00CV1262, 2010 WL 3023517, at * 1 (M.D.N.C. July 28, 2010) (attached as Ex. T) (discussing history of *Duke Energy I*).  On appeal, the Fourth Circuit affirmed *Duke Energy I*, but did not reach the RMRR exclusion issue.  *United States v. Duke Energy Corp. ("Duke Energy II")*, 411 F.3d 539 (4th Cir. 2005). The Supreme Court then reversed the Fourth Circuit's decision without the RMRR issue coming before the Court.  *See United States v. Duke Energy Corp. ("Duke Energy III")*, 549 U.S. 561 (2007).  The district court then issued *Duke Energy IV* on remand.

Case 3:09-cv-00100-JJB-DLD   Document 140-1   02/04/11   Page 20 of 34

The *Duke Energy I* court rejected EPA's argument that the agency's interpretation was entitled to deference, observing that an agency interpretation that conflicts with a prior interpretation is entitled to considerably less deference than a consistently-held agency view. *Id.* at 642. The court also emphasized that the EPA's post-*WEPCo* statements supported a "routine in the industry" standard. For example, in 1990, EPA officials noted that "WEPCO's life extension project [was] not typical of the majority of utilities' life extension projects and concerns that the agency [would] broadly apply the ruling it applied to WEPCO's project [were] unfounded." *Id.* at 636 (quoting GAO Report (Ex. N) at 30-31). Further, "EPA's 1989 emission forecast assumed that the WEPCO decision would not result in a significant number of additional power plants having to comply with the NSPS and the PSD program requirements." *Id.* at 637 (quoting GAO Report (Ex. N) at 31). Moreover, *Duke Energy I* noted that the EPA reiterated its position in 1995 when responding to an industry request to add a "restoration" exemption. *Id.* at 637. The court also noted a number of EPA inspection reports from the 1980s that indicated EPA was aware of the utility industry practice of engaging in life extension projects. *Id.* at 636 n.13. As the *Duke Energy I* court concluded, "[t]hrough the EPA's statements in the Federal Register, its statements to the regulated community and Congress, and its conduct for at least two decades, the EPA has established an interpretation of RMRR under which routine is judged by reference to whether a particular activity is routine in the industry." *Id.* at 637.[11]

---

[11] In finding that RMRR should be defined relative to an industry standard, the *Duke Energy I* court also relied on legislative intent, "concluding that when Congress incorporated the NSPS statutory definition of modification into the PSD amendments, it also incorporated the regulations implementing the NSPS program." *Duke Energy IV*, 2010 WL 3023517, at * 3 (Ex. T) (describing *Duke Energy I*, 278 F. Supp. 2d at 629). Based on that line of reasoning, because the NSPS provision refers to maintenance, repair, and replacement that is "routine for a source category," the *Duke Energy I* court found that the PSD RMRR exclusion also covers those projects that are routine for a source category. *Duke Energy I*, 278 F. Supp. 2d at 632. However, without addressing the RMRR issue, the Supreme Court has clarified that "PSD

In *Duke Energy IV*, the court reaffirmed and clarified its holding from *Duke Energy I* on the proper RMRR standard, stating:

> The EPA is bound by its own interpretation of the PSD regulations, which have consistently referenced industry standards. *Duke I* thoroughly evaluated the statements of the EPA during the WEPCO determination for this case and the EPA's public statements regarding the RMRR exception. The regulatory history establishes that reference to other units in an industrial category must be part of the RMRR analysis and this part of the WEPCO analysis remains unaffected by the Supreme Court's holding in *Duke III*.

*Duke Energy IV*, at * 7. The *Duke Energy IV* court went on to clarify that it would examine routineness both from a unit perspective and from an industry standpoint: "[T]he Court will consider all of the WEPCO factors, including frequency, taking into consideration the work conducted at the particular unit, the work conducted by others in the industry, and the work conducted at other individual units within the industry." *Id.*

3.  The *Alabama Power* opinions.

The U.S. District Court for the Northern District of Alabama also adopted the "routine in the industry" test, based on a careful analysis of the history of the RMRR provision. *See United States v. Alabama Power Co. ("Alabama Power I")*, 372 F. Supp. 2d 1283, 1307 (N.D. Ala. 2005). The *Alabama Power I* court conducted an extensive review of EPA's prior statements about the RMRR exclusion and the facts surrounding EPA's litigating position and applied the factors set out by the Supreme Court in *United States v. Mead Corp.*, 533 U.S. 218 (2001). *See*

---

regulations on 'modification' simply cannot be taken to track the agency's regulatory definition under the NSPS." *Duke III*, 549 U.S. at 577. Accordingly, in *Duke Energy IV*, the district court vacated the *Duke Energy I* ruling on RMRR to the extent it "relied on incorporation of the NSPS regulations into the PSD regulations." *See Duke Energy IV*, 2010 WL 3023517, at * 6 (Ex. T). However, the *Duke Energy IV* court expressly reaffirmed the remaining bases set forth in *Duke Energy I* for application of a "routine in the industry" standard. *Id.* at * 6-7.

Case 3:09-cv-00100-JJB-DLD   Document 140-1   02/04/11   Page 22 of 34

*Alabama Power I,* 372 F. Supp. 2d at 1306-07.[12] The court found that the "routine at the unit" test failed four of the five *Mead* factors — the degree of the agency's care, consistency, formality, and persuasiveness of the agency's position. *Id.* at 1306 ("[I]n the court's eyes, [EPA's position] only pass[es] the 'expertness' prong of *Mead.*"). The court emphasized the fact that EPA's interpretation was entitled to minimal deference due to its prior inconsistent positions on the proper RMRR standard: "EPA's arguments sound more in 'litigation position', which is never entitled to *Chevron* deference, than they do an agency implementation/interpretation of ambiguous statutory language, which is entitled to *Chevron* deference." *Id.* As the court explained: "Given the EPA's zigs and zags represented by its contradictory post-*WEPCO* statements and rules . . . the court cannot say that EPA's interpretation of its rules is due to be afforded *Chevron* deference. EPA admits, as it must, that it has not spoken with one voice, or a consistent voice, or even a clear voice, on this issue." *Id.* Thus, the *Alabama Power I* court rejected EPA's litigating position, and instead applied the test for "routine" published by EPA in 1992 in the *Federal Register. Id.* at 1290 (comparing EPA's current litigating position with prior published regulatory statements); *id.* at 1307 (adopting routine in the industry test).

---

[12] In *Mead*, the Supreme Court held that deference to an agency's interpretation is appropriate only where "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." 533 U.S. at 226-27. Where it is not (as with the "routine at the unit" test), courts should look to "the degree of the agency's care, its consistency, formality, [] relative expertness, and to the persuasiveness of the agency's position." *Id.* at 228. *See also Alaska Dep't. of Envtl. Conserv. v. Envtl. Prot. Agency*, 540 U.S. 461, 487 (2004) ("[EPA's] interpretation in this case, presented in internal guidance memoranda, however, does not qualify for the dispositive force described in *Chevron.*").

Case 3:09-cv-00100-JJB-DLD   Document 140-1   02/04/11   Page 23 of 34

The *Alabama Power* court reaffirmed its ruling on the proper RMRR standard in a separate opinion three years later. *See United States v. Alabama Power Co. ("Alabama Power II")*, 681 F. Supp. 2d 1292 (N.D. Ala. 2008).[13] The court explained:

> It would take a strained reading of the detailed and annotated review of the relevant history set out by the Middle District of North Carolina in *Duke Energy I* to reach a different conclusion from that of *Duke Energy I*. This court believes it is superficial and insufficient to quote the Clay Memorandum and say it forecloses all further discussion. The EPA continued to publish statements about enforcement and RMRR after the Clay Memorandum. Those statements did not occur in a vacuum; the court believes the EPA meant what it said when it called the modifications in *WEPCO* extraordinary and that the EPA did not anticipate bringing additional enforcement actions because of *WEPCO*. The fact that years passed before it did so speaks for itself. The electric utility industry was reading what the EPA was publishing, *e.g.*, EPA's response to Congressman Dingell's "inquiry."

*Alabama Power II*, 681 F. Supp. 2d at 1309 (citation omitted). The *Alabama Power II* court concluded by holding that it would determine whether the projects at issue fell under the RMRR exclusion by applying the WEPCo multi-factor test "'with reference to the industry as a whole, not just the particular [Alabama Power] unit at issue.'" *Id.* at 1312 (quoting *Alabama Power I*, 498 F. Supp 2d at 993).

### 4. The *East Kentucky Power Cooperative* opinion.

In *United States v. East Kentucky Power Cooperative, Inc. ("EKPC")*, 498 F. Supp. 2d 976 (E.D. Ky. 2007), based on a thorough review of the prior case law, the district court agreed that the "routine in the industry" standard was the proper standard for RMRR. The *EKPC* court observed that

---

[13] In light of the Supreme Court's decision in *Duke III*, the *Alabama Power II* court vacated in part its earlier opinion on the "correct legal tests." However, it vacated only that part of the earlier opinion that addressed the emissions increase issue; it did not vacate its prior ruling that the RMRR determination was to be made on an "industry" basis. *See* Order Vacating in Part Memorandum on Correct Legal Tests, *United States v. Alabama Power Co.*, Civil Action No. 2:01-CV-152 (N.D. Ala. Feb. 25, 2008) (attached hereto Exhibit V).

when, as here, the regulatory agency takes an inconsistent view of the regulations, makes inconsistent statements with respect to the regulation, and also enforces the regulation with no discernible consistency (which was the situation at least as of the time the work at issue in this case commenced), the weight to be given that position diminishes considerably in the Court's view. Looking at all the factors outlined in *Mead* with respect to the "fair measure of deference" to be afforded to an agency administering its own regulations, the Court would have to agree with the *Alabama Power Co.* court that the only factor that favors deference to the EPA's current position on the RMRR exclusion is its relative expertness.

*EKPC*, 498 F. Supp. 2d at 993 (citation omitted). The EKPC court concluded:

> [T]he Court finds that the *Duke Energy* case presents a persuasive rationale for rejecting the EPA's position . . . . [T]he Court holds that it will ultimately determine whether EKPC's projects fall under the RMRR exclusion by applying the WEPCO multi-factor test — nature and extent, purpose, frequency, and cost — with reference to the industry as a whole, not just the particular EKPC unit at issue. This does not mean that a particular project will be considered routine simply because it has been performed by another entity within the industry. The test does not turn on whether a particular replacement project has *ever* occurred in the industry or even necessarily the number of times it has occurred within the industry. Rather, the Court will consider all of the *WEPCO* factors, including frequency, taking into consideration the work conducted at the particular EKPC unit, the work conducted by others in the industry, and the work conducted at other individual units within the industry.

*Id.* (Emphasis in original).

5. The *Allegheny* opinion.

In *Pennsylvania Department of Environmental Protection v. Allegheny Energy, Inc.*, No. 05-885, 2008 WL 4960100, at * 7 (W.D. Pa. Sept. 2, 2008) (Ex. U), the court conducted a detailed examination of the prior RMRR rulings and held that the "routine in the industry" focus was the proper standard.[14] The *Allegheny* court started with an analysis of *WEPCo*, observing

---

[14] The initial *Allegheny* decision was a Report and Recommendation by a Magistrate Judge. That ruling was subsequently adopted by the district court. *See Pa. Dep't of Envtl. Prot. v. Allegheny Energy, Inc.*, No. 02:05cv885, 2008 WL 4960090, at *8 (W.D. Pa. Nov. 18, 2008) (attached hereto as Exhibit W) ("The Magistrate Judge thoroughly analyzed the two competing lines of cases and the prior interpretations of the EPA in explaining why the 'routine in the industry' test should be applied. The Court adopts this portion of the [Report and

that the Seventh Circuit "conducted its RMRR analysis with an eye toward whether the project before it was 'routine in the industry', taking its lead from the EPA." *Alleghen*y, 2008 WL 4960100, at * 4 (*quoting WEPCo*, 839 F.2d 911-12). (Ex. U). The *Allegheny* court then noted that, "[f]ollowing *WEPCo*, the EPA clarified its interpretation of RMRR in the Federal Register," in which EPA opined that the RMRR determination "'must be based on the evaluation of whether that type of equipment has been repaired or replaced by *sources within the relevant industrial category*.'" *Id.* (quoting 57 Fed. Reg. 32,314, 32,326 (July 21, 1992) (Ex. B)) (emphasis supplied by court). The court observed that "[t]his stance appears to comport with the [Seventh Circuit's] ruling in *WEPCo*, which deferred to the EPA's original interpretation of RMRR." *Id.*

The *Allegheny* court then noted that, "[i]n subsequent litigation, . . . the EPA narrowed its interpretation of RMRR." *Id.* at *5. The court examined the competing lines of cases and concluded that "we will follow the lead of the Courts in [*WEPCo, EKPC, Alabama Power and Duke Energy I*], which hold that the RMRR exclusion should be analyzed by looking at whether a project was routine in the industry as a whole." *Id.* at *7.

6. The *TVA* opinions.

Finally, the U.S. District Court for the Eastern District of Tennessee reaffirmed that the "routine in the industry" standard is proper, in *National Parks Conservation Association v. TVA ("TVA I")*, 618 F. Supp. 2d 815 (E.D. Tenn. 2009), (Ex. Y) and *National Parks Conservation*

---

Recommendation]. Notably, in the WEPCO Rule, EPA stated that the RMRR analysis 'must be based on the evaluation of whether that type of equipment has been repaired or replaced by sources within the relevant industrial category.' 57 Fed. Reg. at 32,326."); *Pa. Dep't of Envtl. Prot. v. Allegheny Energy, Inc.*, Civil Action No. 05-0885, 2010 WL 1541457, at *6 (W.D. Pa. Apr. 18, 2010) (attached hereto as Exhibit X) (adopting Magistrate's Report and Recommendation on RMRR: "[A]t trial, we will try Allegheny's RMRR defense and will apply the 'routine in the industry' standard to Allegheny's RMRR defense.").

*Association v. TVA ("TVA II")*, No. 3:01-CV-71, 2010 WL 1291335, at *24 (E.D. Tenn. Mar. 31, 2010) (attached hereto as Exhibit Z) ("The Court answers the question of whether these projects are 'routine' within the meaning of the [RMRR] exclusion . . . by examining projects in both the industry as a whole and at [the unit] in particular.").

The *TVA I* court stated that it was "persuaded by the reasoning of those courts that have adopted the 'routine in the industry' standard." 618 F. Supp. 2d at 825. The court observed that, in *WEPCo*, the inquiry conducted by the Seventh Circuit and EPA "essentially compare[d] the unit [at issue] with others in the industry." *Id.* The *TVA I* court found that the EPA's subsequent promulgation of the WEPCo Rule in 1992 clarified that the routineness determination was to be made on an industry-wide basis. *Id.* The court further observed that "[a] 'routine in the industry' standard is also consistent with the RMRR analysis, which requires a case-by-case determination that weighs the nature, extent, purpose, frequency, and cost of the work." *Id.*

After hearing evidence on the RMRR issue at trial, the *TVA II* court ruled that the projects at issue, which included the replacement of all of the boiler tubes in the economizer and replacement of most of the boiler tubes in the superheater at the units in question, were "properly categorized as routine maintenance, repair, and replacement." *TVA II*, 2010 WL 1291335, at *24-31 (Ex. Z). Accordingly, the court entered judgment for TVA. *Id.* at 34.

B.     A Minority Of Courts Have Adopted A Form Of The "Routine At The Unit" Standard.

Against the weight of recent authority discussed above, only one court, the U.S. District Court for the Southern District of Ohio, has deferred completely to EPA's interpretation and adopted fully the "routine at the unit" standard. *See United States v. Ohio Edison*, 276 F. Supp. 2d 829, 861 (S.D. Ohio 2003) ("[w]hether an activity can be considered 'routine maintenance, repair or replacement' is more appropriately judged by how frequently the activity has been

22

performed at the particular unit at issue."). A second court, the U.S. District Court for the Southern District of Indiana, deferred to EPA's unit-based interpretation, but acknowledged that "[h]ow often similar projects are undertaken throughout the industry may inform the analysis." *United States v. Southern Ind. Gas and Elec.*, 245 F. Supp. 2d 994, 1009 (S.D. Ind. 2003) ("SIGECO"); *id.* at 1016 ("*WEPCo* supports the view that the frequency of the project at the particular unit and the frequency of the project within or [the] industry are both relevant considerations.") (emphasis in original); *United States v. Cinergy*, 495 F. Supp. 2d 909, 930-31 (S.D. Ind. 2007) ("'frequency' factor" in RMRR analysis includes consideration of "how frequently a type of repair or replacement is done at a particular unit *as well as how frequently it is done within the industry*") (emphasis added). A third court, without providing supportive analysis, applied the "routine at the unit test," but acknowledged that courts have explained that "'[t]he frequency factor includes a consideration of how frequently a type of repair or replacement is done at a particular unit *as well as how frequently it is done within the industry*.'" *Sierra Club v. Morgan*, No. 07-C-251-S, 2007 WL 3287850, at *11-12 (W.D. Wis. Nov. 7, 2007) (quoting *Cinergy*, 495 F. Supp. 2d at 930-31) (emphasis added). Significantly, even a post-*Ohio Edison* case from the Southern District of Ohio, while following *Ohio Edison's* adoption of the "routine at the unit" standard, still recognized that "industry practices necessarily inform[] that inquiry." *New York v. Am. Elec. Power Serv. Corp.*, No. 2:04-cv-1098, 2:05-cv-360, 2007 WL 539536, at *2 (S.D. Ohio Feb. 15, 2007).

However, unlike the *Duke Energy* line of cases, none of the "routine at the unit" cases provided any meaningful discussion of the EPA's history of inconsistency on the RMRR issue. *See Alabama Power*, 372 F. Supp. 2d at 1305 ("Lacking in the *Ohio Edison* and [*SIGEGO*] opinions are the reasons the EPA's post-*WEPCo* statements and actions (inaction may be a better

23

Case 3:09-cv-00100-JJB-DLD   Document 140-1   02/04/11   Page 28 of 34

performed at the particular unit at issue."). A second court, the U.S. District Court for the Southern District of Indiana, deferred to EPA's unit-based interpretation, but acknowledged that "[h]ow often similar projects are undertaken throughout the industry may inform the analysis." *United States v. Southern Ind. Gas and Elec.*, 245 F. Supp. 2d 994, 1009 (S.D. Ind. 2003) ("SIGECO"); *id.* at 1016 ("*WEPCo* supports the view that the frequency of the project at the particular unit and the frequency of the project within or [the] industry are both relevant considerations.") (emphasis in original); *United States v. Cinergy*, 495 F. Supp. 2d 909, 930-31 (S.D. Ind. 2007) ("'frequency' factor" in RMRR analysis includes consideration of "how frequently a type of repair or replacement is done at a particular unit *as well as how frequently it is done within the industry*") (emphasis added). A third court, without providing supportive analysis, applied the "routine at the unit test," but acknowledged that courts have explained that "'[t]he frequency factor includes a consideration of how frequently a type of repair or replacement is done at a particular unit *as well as how frequently it is done within the industry*.'" *Sierra Club v. Morgan*, No. 07-C-251-S, 2007 WL 3287850, at *11-12 (W.D. Wis. Nov. 7, 2007) (quoting *Cinergy*, 495 F. Supp. 2d at 930-31) (emphasis added). Significantly, even a post-*Ohio Edison* case from the Southern District of Ohio, while following *Ohio Edison's* adoption of the "routine at the unit" standard, still recognized that "industry practices necessarily inform[] that inquiry." *New York v. Am. Elec. Power Serv. Corp.*, No. 2:04-cv-1098, 2:05-cv-360, 2007 WL 539536, at *2 (S.D. Ohio Feb. 15, 2007).

However, unlike the *Duke Energy* line of cases, none of the "routine at the unit" cases provided any meaningful discussion of the EPA's history of inconsistency on the RMRR issue. *See Alabama Power*, 372 F. Supp. 2d at 1305 ("Lacking in the *Ohio Edison* and [*SIGEGO*] opinions are the reasons the EPA's post-*WEPCo* statements and actions (inaction may be a better

23

Case 3:09-cv-00100-JJB-DLD   Document 140-1   02/04/11   Page 28 of 34

choice of words) count for so little. Put another way, if there is a countervailing case to be made to the *Duke Energy* analysis, the court could not find it in *Ohio Edison* or [*SIGECO*].").  The cases adopting the "routine in the industry" standard, by contrast, have carefully studied the EPA's history on the RMRR issue before reaching a conclusion on the proper RMRR standard. *See, e.g., Duke Energy I*, 278 F. Supp. 2d at 634-37.  Moreover, as noted above, "despite according deference to the EPA's narrow interpretation of RMRR, several Courts in [the 'routine at the unit'] camp have ruled that one factor in the analysis — the 'frequency' factor — should be addressed with reference to projects that are performed both in the industry and at a particular unit." *Allegheny*, 2008 WL 4960100, at *5 (Ex. U) (citing *Cinergy*, 495 F. Supp. 2d at 930-31; *SIGECO*, 245 F. Supp. 2d at 1016; and *Ohio Edison*, 276 F. Supp. 2d at 887).

In the end, the majority of court decisions addressing the RMRR standard, including *all* of the most recent ones, have adopted the "routine in the industry" standard as the proper standard for determining "routineness" under the RMRR exclusion.  Those courts have rejected the notion that routineness must be judged *solely* by looking at the unit in question.  This Court should follow the lead of the majority and most recent cases addressing the RMRR issue and adopt the "routine in the industry" standard as well.

C.      EPA's Attempt To Impose A Narrower RMRR Standard Through Litigation Is Unlawful.

EPA cannot change its long-standing interpretation of the RMRR provision by litigation fiat.  Through its position taken in *WEPCo*, its statements in the *Federal Register*, its statements to the regulated community and to Congress and its conduct for at least two decades, EPA established an interpretation of the RMRR provision under which routine is judged by reference

to whether a replacement is common in the industrial category as a whole.[15]  EPA now seeks to apply a different standard, which focuses on the particular unit at issue.

It is of no consequence that EPA's new interpretation may "not directly and expressly contradict the regulation itself [and i]nstead, it contradicts [the agency's] prior consistent interpretation of the regulation." *Shell Offshore*, 238 F.3d at 629.  "'Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself:  through the process of notice and comment rulemaking.'"  *Alaska Prof'l Hunters*, 177 F.3d at 1033-34 (quoting *Paralyzed Veterans of Am. v. D.C. Arena*, 117 F.3d 579, 586 (D.C. Cir. 1997)); *accord Shell Offshore*, 238 F.3d at 629.  *See also Duke Energy I*, 278 F. Supp. 2d at 637.  Otherwise, the agency would be able to evade the notice-and-comment requirements — which are bedrock requirements of administrative law (*see* 42 U.S.C. § 7607(d); Administrative Procedures Act (APA), 5 U.S.C. § 553) — by "in effect amend[ing] its rule" through the guise of a change in interpretation of the regulatory language.  *Alaska Prof'l Hunters*, 177 F.3d at 1034.[16]

_____

[15]  *See Duke Energy I*, 278 F. Supp. 2d at 637 (quoting *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 629 (5th Cir. 2001) ("existing practice" evidence of current interpretation of rule)); *see also, Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1035 (D.C. Cir. 1999); *Am. Nat'l Can*, 126 F. Supp. 2d at 528 ("lack of enforcement speaks volumes.").

[16]  *Accord Shell Offshore*, 238 F.3d at 630 ("An agency that, as a practical matter, has enacted a new substantive rule cannot evade the notice and comment requirements of the APA by avoiding written statements or other 'official' interpretations of a given regulation: '); *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94-95 (D.C. Cir. 1997) ("Otherwise, the agency could evade its notice and comment obligation by 'modifying' a substantive rule that was promulgated by notice and comment rulemaking.").  In *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020 (D.C. Cir. 2000), the D.C. Circuit had these stern words for EPA:

> The phenomenon we see in this case is familiar.  Congress passes a broadly worded statute.  The agency follows with regulations containing broad language, open-ended phrases, ambiguous standards and the like.  Then as years pass, the agency issues circulars or guidance or memoranda, explaining, interpreting, defining and often expanding the commands in the regulations. . . .  Law is made, without notice and comment, without public participation, and without

Case 3:09-cv-00100-JJB-DLD   Document 140-1   02/04/11   Page 30 of 34

Here, like the majority of courts addressing the RMRR issue, the Court should hold that the established interpretation of RMRR — applying a "routine in the industry" standard — is applicable.    Even if EPA could, in notice-and-comment rulemaking, adopt a different interpretation of the RMRR standards, it cannot apply such a new interpretation to LaGen in this litigation, precisely because it did not undertake such a rulemaking process.  As one court stated:

> EPA cannot enforce unforeseen interpretations of the [regulations] simply by invoking the spirit of the CAA, and is particularly forbidden from doing so for the first time in the course of a litigation.  The regulated public must be informed in advance of the rules of the game.  Indeed, with respect to agency action, the regulated public also must have an opportunity to participate in setting those rules.  That is the essence of notice and comment rulemaking.  The EPA cannot escape the strictures of the notice-and-comment rulemaking process by cloaking a substantive [change to the regulations] in the guise of a mere interpretation of an extant regulation.

*Am. Nat'1 Can*, 126 F. Supp. 2d at 530 (citations and footnote omitted).  That is exactly what EPA is attempting to do in this case, and it should not be allowed to succeed.

VI.   <u>CONCLUSION</u>

For the foregoing reasons, LaGen requests that its motion for summary judgment on the proper legal standard for RMRR be granted and that the Court rule that the RMRR exclusion shall be applied in this case using the "routine in the industry" standard.

---

publication in the Federal Register or the Code of Federal Regulations. . . .  An agency operating in this way gains a large advantage.  It can issue or amend its . . . rules . . . quickly and inexpensively without following any statutorily prescribed procedures.  The agency may also think there is another advantage — immunizing its lawmaking from judicial review.  (internal quotation marks and citation omitted).

Case 3:09-cv-00100-JJB-DLD   Document 140-1   02/04/11   Page 31 of 34

Dated: February 4, 2011                    Respectfully submitted,

/s/ Kent Mayo
William Bumpers (admitted *pro hac vice*)
Kent Mayo (admitted *pro hac vice*)
Michael Heister (admitted *pro hac vice*)
Megan Berge (admitted *pro hac vice*)
Baker Botts LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
(202) 639-7700

      -and-

/s/ Ryan E. Johnson
Ryan E. Johnson (La. Bar No. 26352)
Jones, Walker, Waechter, Poitevent,
Carrère & Denègre, L.L.P.
8555 United Plaza Blvd., 5th Floor
Building Four
Baton Rouge, LA 70809
(225) 248-2000

      -and-

R. Patrick Vance (La. Bar Roll No. 13008)
Jones, Walker, Waechter, Poitevent,
Carrère & Denègre, L.L.P.
201 St. Charles Avenue
New Orleans, Louisiana 71170-5100

*Counsel for Louisiana Generating LLC*

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

_____

**UNITED STATES OF AMERICA,**    )
    )
       **Plaintiff,**    )
    )
       **v.**    )    **Civil Action No. 09-CV-100-RET-CN**
    )
**LOUISIANA GENERATING LLC,**    )
    )
       **Defendant.**    )
_____)

### CERTIFICATE OF SERVICE

I certify that on this day, a copy of the foregoing Memorandum in Support was filed electronically with the Clerk of the Court using the CM/ECF system. I also certify that the following counsel will receive service of the Motion and Proposed Order via that system:

Richard M. Gladstein
U.S. Department of Justice
P.O. Box 7611
601 D. Street, NW, Room 2121
Washington, DC 20004
202-514-1711
Email: richard.gladstein@usdoj.gov

John Joseph Gaupp
United States Attorney's Office - BR
Middle District of Louisiana
777 Florida Street, Suite 208
Baton Rouge, LA 70801
225-389-0443
Fax: 225-389-0685
Email: john.gaupp@usdoj.gov

Dwana Christy King
Christopher Alan Ratcliff
Louisiana Department of Environmental Quality
P.O. Box 4302
Baton Rouge, LA 70821-4302
225-219-3985
Fax: 219-4068
Email: dwana.king@la.gov
Email: chris.ratcliff@la.gov


Dated: February 4, 2011      /s/ Kent Mayo_____