UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA,
Plaintiff,

LOUISIANA DEPARTMENT OF                    CIVIL ACTION
ENVIRONMENTAL QUALITY,
Plaintiff-Intervenor,                      NO. 09-100-JJB-CN

VERSUS

LOUISIANA GENERATING, LLC,
Defendant

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on three Motions for Partial Summary

Judgment under Rule 56 of the Federal Rules of Civil Procedure. There are

numerous motions pending. Parties have advised that resolving these three will

potentially resolve a number of them. Plaintiffs have filed one Motion (doc. 136)

while Defendant has filed two (docs. 138, 139). Parties have filed briefs the on

the motions. Oral argument was heard. This Court's jurisdiction exists pursuant

to 28 U.S.C. § 1332. For the reasons stated herein, Plaintiffs' motion is

GRANTED in part and DENIED in part; Defendant's motions are DENIED.

## Background

### 1. Factual Background

This case revolves around the Big Cajun II ("BCII") power plant, a coal-

fired electric utility steam generating plant in New Roads, Louisiana. This plant

began operation in 1981 and consists of three units, conveniently named Unit 1, Unit 2, and Unit 3. It is certain work done at Units 1 and 2 in 1998 and 1999 that forms the basis of the present lawsuit by the federal and state government. In 1994, Cajun Electric, BCII's then-owner, filed for Chapter 11 Bankruptcy protection. As part of its reorganization plan, substantially all of Cajun Electric's assets, including BCII, were put up for sale through auction. NRG Energy ("NRG") was involved in the auction process from the beginning in 1994. During the six-year process, there were various asset purchase agreements entered between NRG and the Chapter 11 Trustee. The Fifth Asset Purchase Agreement ("Fifth APA"), signed in September, 1999, was the last and the one whose terms embody the parties' agreement. Part of the Fifth APA called for the Defendant to assume any environmental liabilities that attached to the owner of the acquired assets by operation of law. (Doc. 136-3 at 28.) The sale was completed on April 1, 2000, by which time NRG had formed the Defendant, Louisiana Generating, LLC ("LaGen") as a subsidiary. LaGen is the full owner of BCII.

Before the sale to LaGen, the Court notes at this time that two sets of significant repairs were made to Units 1 and 2. They are outlined below.

In 1994 and 1995, Cajun Electric performed work on Units 1 and 2, upgrading the turbines ("the 1994/95 work"). It did not seek any permits before performing the work, which would violate the Clean Air Act ("CAA") only if emissions were increased as a result of the work. As part of its due diligence,

2

NRG's investigator alerted his company of his suspicions that this work triggered liability under the CAA. Specifics of the CAA will be discussed below. It is important to note that this turbine work did not actually lead to such liability and is not the subject of this lawsuit—however, it may be relevant to the discussion of what NRG knew or reasonably suspected about the next set of repairs Cajun Electric made to Units 1 and 2.

In 1998 and 1999, Cajun Electric again performed repairs on Units 1 and 2, this time replacing portions of the primary boiler reheaters—Unit 1 in 1998 and Unit 2 the next year ("the 1998/99 work"). Again, this work was done without a permit. The cost of each project was estimated at $5 million. The Trustee notified all of the bidders, including NRG, about this project. NRG did not perform any due diligence on potential CAA liability for this work. The question of whether this work constituted a modification, thereby triggering the PSD program requirements, is not before the Court at this time. What is before the Court is what effects would potentially ensue should the 1998/99 work later be determined to have been a modification.

In September of 2001, LaGen submitted a revised Title V permit application for BCII. In February of 2005, while the application was still pending, EPA issued a notice of violation ("NOV") regarding the 1998/99 work. This NOV was forwarded to LDEQ. LDEQ issued the permit in August of 2005. LDEQ renewed this permit in 2011. Despite the NOV, the EPA did not formally object to the issuance of the permit or its renewal.

3

## 2. Regulatory Background

For the purposes of these motions, a basic overview of the Clean Air Act will suffice. Under the Act, the Environmental Protection Agency ("EPA") Administrator is charged with promulgating national ambient air quality standards ("NAAQS"). Each state is to submit its own implementation plan (SIP) that provides for attainment and maintenance of the NAAQS.

### A. Prevention of Significant Deterioration

Two sections of the Act are relevant to this case. First is the Prevention of Significant Deterioration of Air Quality ("PSD") program, found in Title 42 of the United States Code, Sections 7470-7492. The program is designed to assure economic growth will occur in such a way as to protect clean air resources. This is accomplished by requiring certain things to be done by a facility before a permit to construct a facility may be issued. Certain modifications to existing facilities are included in the definition of "construction." 42 U.S.C. § 7479(2)(c). The term modification means any change to a stationary source that "increases the amount of any air pollutant emitted by such source" or leads to the emission of any new pollutant. 42 U.S.C. § 7411(a)(4).

The PSD provisions mandate that, before construction on a major emitting facility (of which BCII is one) is commenced, eight things must take place: (1) a permit setting forth emission limitations must be issued; (2) the proposed permit has been analyzed and a public hearing has been held; (3) the owner must demonstrate that emissions will not increase emissions (using several

4

parameters); (4) ensure that the proposed facility is subject to the best available control technology ("BACT") for pollutants; (5) comply with those BACT provisions; (6) study projected impacts that may result from the growth of the facility; (7) the owner/operator must agree to monitor to determine the effect of emissions from the facility; and (8) certain approval that is not relevant to this case. 42 U.S.C. § 7475(a)(1)-(8).

It is up to the facility to determine up-front whether it should request a preconstruction permit. As mentioned above, because Cajun Electric did not deem either the 1994/95 work or the 1998/99 work to be modifications, it did not apply for PSD permits. Because it was later determined by regulators that the 1994/95 work was indeed not a modification, Cajun Electric faced no liability for not seeking a permit. The determination regarding the 1998/99 work has yet to be made. The requirements under § 7475(a)(4) and (5), the BACT requirements, are of particular importance to this case as they call for implementation of potentially costly control technologies.

### B. Title V Operating Permits

While the PSD program relates to preconstruction permits, Title V of the CAA deals with operating permits. 42 U.S.C. §§ 7661-7661f. As with the PSD program, Louisiana has a corresponding Title V operating permit program. LAC 33:III Chapter 5. Title V does not set forth any new requirements for source operators; it is designed to have all emissions limitations and applicable PSD provisions (such as BACT) in one easily accessible location. It is unlawful to

5

operate without a Title V operating permit or to operate except in compliance with an operating permit issued under Title V.

### C. Enforcement

The EPA Administer may bring civil actions against any person who violates either the PSD program, the Title V program, or the Louisiana SIP program. 42 U.S.C. § 7413(a)(1) and (3). The Administrator also seek civil injunctive relief and/or fines for such violations. 42 U.S.C. § 7413(b). The Administrator may also bring an action for an injunction to stop construction of or modification of a major emitting facility that does not conform with the PSD program requirements. 42 U.S.C. § 7477.

## **Summary of the Arguments**

### 1. Plaintiffs' Motion on Successor Liability

In their Motion, Plaintiffs seek summary judgment on the issue of successor liability, arguing that LaGen expressly assumed Cajun Electric's CAA liability. In making this argument, they essentially argue two points: (1) that the law does not prohibit successor liability in this situation; and (2) that LaGen actually did assume Cajun Electric's liabilities under the CAA. (Doc. 146). As to the first point, Plaintiffs claim that New York law, which the parties agreed would govern the purchase, allows for such successor liability where there is an express or implied agreement to do so. Plaintiffs also point to case law from several circuits allowing successor liability when the assumption was made under

6

the terms of an asset purchase agreement. They also point to case law where courts have applied successor liability under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and also under the CAA.

As to the second point, Plaintiffs point to the terms of the Fifth APA and the assumption language found in paragraph 2.4. They argue LaGen meets the criteria set forth in the paragraph in that it knew or reasonably expected the 1998/99 work could trigger PSD liability. They also argue that the phrase "operation of law" included in paragraph 2.4 includes liability under the CAA.

Defendant counters that the CAA imposes liability only on the person owning or operating the facility when the violation occurs and that the act itself prohibits the application of successor liability. It further argues that the common law principles employed by the Plaintiffs do not apply and that the cases Plaintiffs cite to are inapposite. Defendant points to a line of cases finding no successor liability in this situation.

Defendant also argues that, even if successor liability is not barred by the CAA, the Fifth APA itself clearly shows LaGen did not assume Cajun Electric's PSD liabilities. It asserts there is no ambiguity in paragraph 2.4 and that therefore, Plaintiffs' parol evidence is inadmissible to determine the intent of the parties. Further, this parol evidence does not support Plaintiffs' contentions and the fact that they are using it makes this issue inappropriate for summary judgment.

*2. Defendant's Motion on PSD Liability*

In its first motion (doc. 138-1), Defendant argues three things: (1) it has no direct liability under the CAA for potential PSD violations committed by its predecessor, i.e. LaGen was not required to apply for a permit for a facility it did not own; (2) the Fifth APA does not provide an alternative basis for holding LaGen liable for Cajun Electric's potential PSD violations and (3) the statute of limitations has run out for any PSD claims, federal or state. The first two points are closely related the arguments made by the parties in Plaintiffs' motion on successor liability. As to the third, Defendant argues that a PSD violation is a one-time occurrence that took place when the work was done without a permit. As this was more than 10 years ago, it has far exceeded the five-year statute of limitations that applies to this situation. It points to case law supporting this argument.

In opposition, Plaintiffs point to different cases supporting their view that a PSD violation is an ongoing offense. Although there are two cases from the Fifth Circuit that address this issue, the parties disagree about whether either is controlling.

### 3. Defendant's Motion on Title V Liability

In its second motion (doc. 139-1), Defendant claims it is entitled to summary judgment on the Title V operating permit claims for three reasons: (1) because they are based entirely on the invalid PSD claims; (2) because Plaintiffs have not alleged that any of LaGen's conduct has created liability under Title V or

the Louisiana SIP; and (3) the Title V claims are an improper collateral attack on the BCII Title V permit.

As to the first argument, Defendant claims the Title V violations Plaintiffs allege are operating without PSD permits. Therefore, if the Court grants Defendant's motion on PSD liability, there will be no Title V violation. Plaintiffs counter that Title V is a continuing obligation and that the Title V claims are separate. They point to a case where the court dismissed PSD claims but allowed the plaintiffs to pursue Title V claims based on operating with a deficient permit.

In its second argument, Defendant claims that the Plaintiffs have not alleged any conduct by it that has created liability under either Title V or the Louisiana SIP. LaGen submitted a Title V permit application in 2001 that was approved by LDEQ without objection from the EPA. It also claims Title V creates a "no look back" policy that does not require an applicant to review past projects for PSD compliance. Additionally, Defendant asserts that, when EPA issued a notice of violation ("NOV") in 2005, it did not trigger an obligation to amend its earlier Title V application. LDEQ had received the NOV and still chose to reissue LaGen's permit in 2005. Further, Defendant argues Title V does not create liability for operating with an allegedly "inadequate" permit.

Plaintiffs counter that LaGen failed to submit a complete Title V application, including a compliance plan to meet BACT requirements. They point to regulations to support their argument that LaGen has an obligation to

9

supplement or correct its application.  Also, they claim there is Title V liability for operating with an inadequate permit and point to case law to support this view.

Finally, LaGen's third argument is that the Title V claims are really a collateral attack on the permit itself—that LDEQ and EPA had a chance to object and/or reject the permit but did not.  Further, Defendant claims Plaintiffs have the authority to reopen and revisit the permit using an administrative process but have not done so.  LaGen points to case law holding the EPA may not bring an enforcement action against an owner or operator whose only alleged violation is acting in compliance with a facially valid permit.

Plaintiffs claim this is not a collateral attack on BCII's Title V permit.  They claim there is no requirement that EPA object to a Title V permit application in order to be able to later bring an enforcement action. They further argue that they may pursue permit deficiencies in an enforcement action in this court. They point to case law that supports their position.  Finally, Plaintiffs argue each day LaGen is liable for operating without a valid Title V permit and that fines and injunctive relief are appropriate.

## Standard of Review

A motion for summary judgment should be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a).  If the dispositive issue is one on which the nonmovant will bear the

burden of proof at trial, the moving party satisfies its burden by pointing out that there is insufficient proof concerning an essential element of the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets the initial burden of showing there is no genuine dispute as to material fact, the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a genuine dispute for trial. *Allen v. Rapides Parish Sch. Bd*., 204 F.3d 619, 621 (5th Cir. 2000). Doubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party. *Evans v. City of Bishop*, 238 F.3d 586, 589 (5th Cir. 2000).

## Discussion

*1. Plaintiffs' Motion on Successor Liability*

The Court notes that this motion seeks only to determine whether LaGen is liable as a successor for whatever PSD liability Cajun Electric may have incurred through its failure to obtain preconstruction permits for the 1998/99 work. Each of the parties' arguments will be addressed in turn.

### a) Does the Doctrine of Successor Liability Apply to the CAA?

It is undisputed that LaGen was not the owner of BCII when the 1998/99 work was done, thus it was not responsible at the time for securing PSD permits for the work. Plaintiffs claim LaGen assumed that liability through the Fifth APA. Before getting to the contract, however, the Court must first determine whether

Case 3:09-cv-00100-JJB -CN   Document 260   12/01/11   Page 11 of 30

the theory of successor liability is applicable to this situation. The Court finds it is.

Plaintiffs point to two cases that have allowed successor liability in the CAA setting.[1] They also argue that the universal acceptance of the theory's application in the CERCLA setting should persuade the Court in this case as well. Defendant contends the express language of the CAA prohibits the application of successor liability and that there are critical distinctions between CERCLA and the CAA that make analogizing them inappropriate. First, the Court will address the statutory argument.

Defendant claims the civil enforcement provision found at 42 U.S.C. § 7413 acts as an express prohibition against the use of successor liability. (Doc. 153-2 at 9-15). According to the provision:

> The Administrator shall, as appropriate, in the case of any person that is the owner or operator of an affected source, a major emitting facility, or a major stationary source, **and may, in the case of any other person**, commence a civil action for a permanent or temporary injunction, or to assess and recover a civil penalty of not more than $25,000 per day for each violation, or both, in any of the following instances:
>
> **(1)** Whenever **such person** has violated, or is in violation of, any requirement or prohibition of an applicable implementation plan or permit. Such an action shall be commenced (A) during any period of federally assumed enforcement, or (B) more than 30 days following the date of the Administrator's notification under subsection (a)(1) of this section that such person has violated, or is in violation of, such requirement or prohibition.

---

[1] *New Jersey v. Reliant Energy*, 2009 WL 3234438 (E.D. Pa. 2009); *United States v. MPM Contractors*, 763 F.Supp. 488 (D.Kan 1991). These cases will be discussed below.

Case 3:09-cv-00100-JJB -CN   Document 260   12/01/11   Page 12 of 30

**(2)** Whenever such person has violated, or is in violation of, any other requirement or prohibition of this subchapter, section 7603 of this title, subchapter IV-A, subchapter V [Title V actions], or subchapter VI of this chapter, including, but not limited to, a requirement or prohibition of any rule, order, waiver or permit promulgated, issued, or approved under this chapter, or for the payment of any fee owed the United States under this chapter (other than subchapter II of this chapter).

**(3)** Whenever such person attempts to construct or modify a major stationary source in any area with respect to which a finding under subsection (a)(5) of this section has been made.

42 U.S.C. § 7413(b) (emphasis added). Under Defendant's reading of the statute, the Administrator is authorized to enforce the CAA against "a person that is the owner or operator" only where "such person" has in fact violated the state SIP or a permit. Defendant refers to several dictionary definitions of "such" in arguing it should modify the last antecedent. Defendant asserts that, in this case, it is the "owner or operator" of a major emitting facility. Thus, Defendant argues that since Cajun Electric was the owner or operator who did not get the PSD permit, it is Cajun Electric and Cajun Electric alone who can be the "such person" enforcement is permitted against. (Doc. 153-2 at 9-10).

While this is a good argument against being held directly liable for its predecessor's actions, it does not provide a reason not to apply the successor liability doctrine to this case. Defendant provides no support for its assertion that unless the CAA expressly provides for assignment, successor liability cannot be employed. Rather, the Court is persuaded by the case law that suggests the doctrine is so well established that Congress would have to expressly exclude its

13

application in a statute.  In *United States v. Mexico Feed and Seed Co., Inc.,* the

Eighth Circuit concluded:

> In fact, corporate successor liability is so much part and parcel of
> corporate doctrine, it could be argued that Congress would have to
> explicitly exclude successor corporations if it intended its use of a
> legal term of art, "corporation," not to include established
> conceptions of the extent, life span, and path of corporate liabilities.

980 F.2d 478, 486 (8th Cir. 1992).  Indeed, every circuit that has addressed this

issue has come to the same conclusion.  *See North Shore Gas v. Salomon Inc.,*

152 F.3d 642 (7th Cir. 1998) (compiling cases) (*revs'd on other grounds*).  And

though these cases deal with CERCLA, the Court finds no reason not to apply

the analysis to this case. Just as in CERCLA, the CAA defines "person" to

include corporations and associations.  42 U.S.C. § 7602(e), *see also* 42 U.S.C.

9601(21).  Congress has directed that when using the word "company" or

"association" in reference to a corporation, it "shall be deemed to embrace the

words 'successors and assigns of such company or association.'"  1 U.S.C. § 5.

The Court finds nothing in the statute to suggest the ordinary rule of statutory

construction should not apply to the definition of corporation in the CAA.

Plaintiffs present two cases that have applied successor liability in the CAA

setting.  In *New Jersey v. Reliant Energy Mid-Atlantic Power Holdings, LLC*, the

court held a successive owner liable for its predecessor's failure to secure a PSD

permit, even without an assumption clause in the purchase agreement.  2009 WL

3234438 (E.D. Pa.).  This Court is not being asked to take such a large step, but

14

it notes that the *Reliant* court found no statutory bar to successor liability. In *United States v. MPM Contractors, Inc*., the district court granted a preliminary injunction against an asbestos removal contractor, finding the plaintiffs had shown a substantial likelihood of success on the merits on its successor in liability claim. 763 F.Supp. 488 (D. Kan. 1991). In conducting the success liability analysis, the district court saw no bar set forth by the CAA.

The case Defendant presents on this issue is inapposite. While the court in *United States v. Midwest Generation, LLC,* did not allow the defendant to be liable for PSD violations by its predecessor, it did not conclude that successor liability was forestalled by the language of the statute. 694 F.Supp. 2d 999, 1008 (E.D. Ill. 2010). After concluding it would be "counterintuitive" to allow liability for "failure to follow [the CAA's] preconstruction requirements on a person for whom compliance would have been impossible," it addressed the assumption clause in a short footnote. In that footnote, the court found that only "persons" and not "sources" could be liable under the statute. Further, the court found "the allegations in the complaint do not support the theory of transferred liability." *Id*. at 1008 n. 9. The court notes that the Midwest court did not find the doctrine statutorily prohibited, it simply found the facts not to merit application.

The Court is persuaded by *Reliant* and *MPM* in that they both find no statutory bar to successor liability in the CAA.

Defendant also argues that CAA is a quasi-criminal statute and therefore its interpretation should not be informed by CERCLA, which is a remedial statute.

15

The Court disagrees with this assertion. Although there is no statement of congressional purpose behind the CAA (as there is with CERCLA), the Court agrees with Plaintiffs that the enforcement provisions in the CAA are intended to remediate any noncompliance with the act, as such noncompliance leads to pollution and harm to the air.

In summary, the Court finds there is nothing in the CAA itself that prohibits the application of the common law doctrine of successor liability. The decision whether to apply it will depend on whether the exception to the general rule against successor liability applies.

### b) Did LaGen Assume Cajun Electric's CAA Liability?

The traditional common law rule of successor liability in a corporate setting is that when a corporation acquires the manufacturing assets of another, it does not acquire the liabilities of the predecessor corporation. 13 A.L.R. 6th 355 at § 2. There are four recognized exceptions to this rule: (1) when the successor expressly or impliedly agrees to assume the liabilities of the predecessor; (2) when the transaction may be considered a de facto merger; (3) when the successor may be considered a "mere continuation" of the predecessor; or (4) when the transaction was fraudulent. *Mozingo v. Correct Mfg. Corp.,* 752 F.2d 168, 174 (5th Cir. 1985). New York law, which the parties agreed would govern their transaction, allows for the same four exceptions. *In re Seventh Judicial District Asbestos Litig.,* 788 N.Y.S. 2d 579, 581 (Sup. Ct. 2005). Plaintiffs do not argue that any other than the first exception applies to this matter. They argue

16

that the terms of the Fifth APA show an express assumption of CAA liability. Defendant claims it did not assume such liability from Cajun Electric.

In addition to certain specific assumed liabilities that are not at issue, Defendant agreed in Section 2.4 of the Fifth APA to assume "any Environmental Liabilities that attach to the owner of any of the Acquired Assets by operation of Law." (Doc. 136-3 at 28). Environmental Liabilities are defined to include "any known or reasonably expected liability or obligation . . . under any Environmental Law." (*Id*. at 16). Environmental Law is defined broadly to include any law relating to pollution or protection of human health or the environment, including those relating to emissions. (*Id*). The Acquired Assets include BCII Units 1 and 2. (*Id*. at 9).

Defendant argues first that the terms of the agreement indicate it did not assume Cajun Electric's liability. It points to the phrase "operation of Law" from Section 2.4 and repeats its argument from above: because the CAA provides PSD liability only for the person who actually failed to get the permits and LaGen is not that person, there is no liability to assume by operation of the CAA. As the Court has held that the doctrine of common law successor liability is applicable, this argument is without merit.

Defendant further argues Plaintiffs seek to read out the phrase "that attach to the owner of any of the Acquired Assets," contending this language restricts the area of potential liability. The Court agrees with Plaintiffs that this language is not limited in time but includes actions that occur after the sale of BCII. (Doc.

17

179-2 at 21-22). Further, the Court notes that, under the successor liability doctrine, LaGen steps into the shoes of Cajun Electric, thus, this temporal dispute is moot. The Court finds the terms of the contract are clear and that the Defendant assumed any environmental liability that it knew about or reasonably expected at the time of the signing of the Fifth APA.

The next question is whether the potential PSD liability for the 1998/99 work was either known by LaGen or reasonably expected by it at the time of the agreement. Before analyzing this, the Court must determine what role, if any, parol evidence is to play. Defendant argues that the Fifth APA is clear and unambiguous and therefore it is not allowed at all. Plaintiffs argue that, while the terms are unambiguous, the application is ambiguous, thus justifying the use of parol evidence.

Both parties point to parol evidence on the knew-or-reasonably-expected issue: Plaintiffs show NRG's inspector Mr. Evans's concern over potential liability from the 1994/95 work and argue that because LaGen did no further due diligence surrounding the 1998/99 work (which it was properly informed of before it commenced) it effectively hid its head in the sand regarding potential liability from that work. On the other side, Defendant points to the assertions of the Trustee in the Fifth APA to the effect that Cajun Electric was in compliance with all environmental laws (doc. 136-3 at 31) as well as the ultimate finding that the 1994/95 work was exempt from the PSD program as evidence they did not know or reasonably expect the potential liability. (Doc. 153-2 at 19-21).

18

The Court finds that while the 1998/99 work was of the type that might attach liability to Defendant under Section 2.4 of the Fifth APA, there exists a genuine dispute as to the material factual question of whether the Defendant knew or reasonably expected the 1998/99 work to BCII Units 1 and 2 created liability under the CAA. Thus, the discreet factual question of whether Defendant knew or reasonably expected the 1998/99 work to create CAA liability is inappropriate for summary judgment and will move forward to trial.

In conclusion to the issue of successor liability, Plaintiffs' motion is GRANTED in that the theory is available in this case and that the Defendant expressly assumed all environmental liability it knew about or reasonably expected at the time of the Fifth APA. However, the motion is DENIED in that there is a genuine dispute as to the material fact of whether Defendant knew or reasonably expected the 1998/99 work created liability under the CAA.

### 2. *Defendant's Motion on PSD Claims*

In its first motion, LaGen makes three arguments: (1) that it cannot be directly liable for Cajun Electric's failure to obtain preconstruction PSD permits, (2) that the Fifth APA does not allow for LaGen to be liable for same, and (3) that the statute of limitations has run on both the federal and state claims. As the Court has already decided LaGen assumed through the Fifth APA whatever environmental liabilities it knew or reasonably expected at the time of the agreement, the first issue is pretermitted. The second issue has been addressed above. The statute of limitations issue presents a very interesting question.

19

As the CAA does not provide a period of limitation period for enforcement actions for violations, the general five-year statute of limitations found in 28 U.S.C. § 2462 applies. *NPCA v. TVA*, 502 F.3d 1316, 1322 (11th Cir. 2007). The clock begins to run on the date the claim first accrues. 28 U.S.C. § 2462. Defendant contends that the claim accrued on the day construction began, in 1998, and therefore the statute of limitations has long since run. (Doc. 138-1 at 36). Plaintiffs counter that where the violation is an ongoing violation, the statute of limitations is tolled. (Doc. 154-2 at 37). As the PSD provision of the CAA does not indicate whether failure to get a preconstruction permit is an ongoing violation or not, the Court will look to the relevant case law for guidance.

While there is disagreement between the courts on this question, Plaintiff contends the Fifth Circuit has spoken, finding in *United States v. Marine Shale Processors* that a PSD violation is an ongoing violation. Defendant counters that *CleanCOALition v. TXU Power*, a more recent Fifth Circuit case, speaks more clearly on the matter. The Court finds that *Marine Shale* is applicable to the current situation.

The defendant in *Marine Shale* was a hazardous waste treatment facility. 81 F.3d 1329 (5th Cir. 1996). Under the CAA it was treated as a minor source of emissions. The court rejected its defense that, because its violative emissions began more than five years before the enforcement action, the entire suit was time-barred. *Id.* at 1357. The court held that, while the civil fines could not be levied for more than five years prior to the action, the entire action was in no way

20

time-barred, calling the defendant's argument "frivolous." The Court found that the $25,000 per day fine provision of § 7413(b) "contemplates a fine for each day a minor source operates in violation of law, and section 2462 limits the number of days to five years before the filing of the complaint." *Id.* The Court finds that this indicates that PSD violations are ongoing violations. Although LaGen is a major source, the Court notes the *Marine Shale* court was interpreting the same enforcement statute and finds it should apply here as well.

Defendant claims that the more recent *CleanCOALition* case should control this situation. 536 F.3d 469 (5th Cir. 2008). In that case, an environmental group brought suit against a utility to enjoin the construction of a coal-fired plant in their community. The court upheld the ruling that an allegedly incomplete permit application was not a cause of action under the CAA until construction had begun. Defendant emphasizes the language, "the preconstruction requirements . . . are preconditions for *granting* a preconstruction permit." *Id.* at 477 (emphasis in original). However, Defendant neglects to finish the sentence, "not preconditions for *filing* a preconstruction permit application." *Id.* (emphasis in original). Defendant asks too much of *CleanCOALition*, it does not address the continuing nature of a violation; it only states the earliest such a violation can arise. The fact that the Fifth Circuit did not mention Marine Shale indicates it did not intend to overrule its statement of law on the statute of limitations issue.

As the Court finds *Marine Shale* to be controlling, there is no need to examine the other cases on the statute of limitations question. The statute of limitations for the claims under the CAA has not run, although enforcement for civil penalties is limited to five years from the time the suit was filed. The Court notes that there is ample support for the proposition that the statute of limitations does not apply to actions for equitable relief in CAA enforcement actions, such as injunctions. *See Sierra Club v. Dairyland Power Cooperative*, 2010 WL 4294622 (W.D. Wis); *New York v. Niagara Mohawk Power Corp.*, 2003 WL 23356447 (W.D.N.Y); *Commonwealth of Pennsylvania v. Allegheny Energy, Inc.,* 2006 WL 1509061 (W.D. Pa.).

As for the state law claims by the LDEQ, they also are subject to a five year limitation period. The relevant provision of the Louisiana SIP provides:

> . . . an action, suit, or proceeding by the state for the assessment or enforcement of any civil fine or penalty under the Louisiana Environmental Quality Act shall not be entertained unless commenced within five years from the date when the claim first accrued . . . For the purposes of this Subsection, a claim for a civil fine or penalty first accrued when the violation is first reported to the Department of Environmental Quality, in accordance with applicable laws and regulations.

La. R.S. 30:2025H. Defendant claims that the latest time the clock could start would be when the NOV was delivered by EPA. As the relevant wording of the Louisiana provision is identical to that of 28 U.S.C. § 2462 and there is no case law to the contrary, the Court finds that the suit is not barred. Rather, it will apply the same rule from *Marine Shale*: that LDEQ will be barred from collecting

Case 3:09-cv-00100-JJB -CN   Document 260   12/01/11   Page 22 of 30

potential civil penalties from more than five years before suit was filed. Any injunctive relief will not be affected by the statute of limitations.

In sum, the Court pretermits the issue of whether Defendant can be directly liable under the CAA for PSD violations caused by Cajun Electric's failure to apply for a PSD permit and DENIES the Motion on the contract and statute of limitations questions.

### 3. Defendant's Motion on Title V Claims

Defendant seeks summary judgment on the Title V operating permit claims for three reasons: (1) they are based on invalid PSD claims; (2) Plaintiffs have not alleged any conduct by LaGen that creates Title V liability and (3) the Title V claims are an improper collateral attack on Defendant's Title V permit.

### a) The Role of the PSD Claims in the Title V Claims

Defendant argues that Title V does not impose independent obligations on owners and operators; it merely consolidates all applicable requirements into a single document that facilitates compliance and that, if the Court grants Defendant's motion regarding PSD liability, it must by law dismiss this as well. (Doc. 139-1 at 14). Plaintiffs claim that LaGen has not satisfied its continuing obligation under Title V to promptly supplement and correct its permit application to reflect the PSD applicability from the 1998/99 work, which is a separate violation of Title V.

Case 3:09-cv-00100-JJB -CN   Document 260   12/01/11   Page 23 of 30

The Court finds that, under Title V of the CAA, owners and operators have ongoing duties to complete operating permit applications and also to supplement or correct those applications "upon becoming aware of such failure or incorrect submittal." 40 C.F.R. §§ 70.5(a) – (b). Therefore, if it turns out that the 1998/99 work means the PSD program is applicable, then LaGen will have violated these two provisions. This would be so regardless if it is itself liable for the PSD violations in the first place (i.e. even if they do not pass the "knew or reasonably expected" test for assumption). The Court finds the reasoning of the *Niagara Mohawk II* court persuasive. In *Niagara Mohawk I*, the court dismissed PSD claims against the defendant because a former owner had done the work that led to the violations.[2] In a subsequent motion, the court allowed the plaintiff to bring a Title V claim for operating with a deficient permit, noting the "Title V operating permits incorporate substantive requirements found in the [CAA] that were applicable to the Facilities at the time they were modified." 2003 WL 23356447 at *2 (W.D.N.Y. 2003). Defendant claims this case is distinguishable because the requirements were in the *Mohawk* defendant's own Title V permit. The Court finds the language of 42 U.S.C. § 7661b(b)(1) require the source to, in its permit application, submit a plan to comply with "all applicable requirements under this chapter." This chapter refers to the CAA and all applicable requirements would include the PSD program, if it applies. The Court finds this language creates the obligation Defendant claims is lacking.

The Court finds that if the 1998/99 reheater work triggered PSD liability and a BACT requirement, this would be a violation of Defendant's Title V permit.

---

[2] 263 F.Supp. 2d 650 (W.D.N.Y 2003). The Court notes there was no assumption clause in the APA in that case.

Case 3:09-cv-00100-JJB -CN   Document 260   12/01/11   Page 24 of 30

b) <u>Have Plaintiffs alleged conduct by LaGen that creates Liability?</u>

Defendant contends Plaintiffs have not alleged conduct that creates Title V liability for several reasons. First, LaGen argues that when it submitted its first Title V permit application, neither EPA nor LDEQ had made a finding about the potential PSD liability. Defendant argues there is no duty to look back to applicability for prior projects under Title V. Plaintiffs counter that, when submitting a Title V permit, the source's duty to submit a true, accurate and complete application is not dependent on notice from EPA as to PSD applicability. (Doc. 155 at 21).

Both parties point to a white paper issued by the EPA relating to Title V obligations of a source. According to the white paper:

> Companies are not federally required to reconsider previous applicability determinations as part of their inquiry in preparing part 70 permit applications. However, EPA expects companies to rectify past noncompliance as it is discovered. Companies remain subject to enforcement actions for any past noncompliance with requirements to obtain a permit or meet air pollution control obligations. In addition, the part 70 permit shield is not available for noncompliance with applicable requirements that occurred prior to or continues after submission of the application.

(Doc. 139-7 at 30-31). Defendant highlights the first sentence of the paragraph to bolster its "no look back" conclusion. However, it ignores the rest of the paragraph, which clearly states the companies are not off the hook for past noncompliance under Title V.

Case 3:09-cv-00100-JJB -CN   Document 260   12/01/11   Page 25 of 30

The Court finds that one of the duties of the source in applying for a Title V permit is that it be certified for "truth, accuracy, and completeness." 40 C.F.R. § 70.5(d). Further, this certification must be "based on information and belief formed after *reasonable inquiry*." *Id*. (emphasis added). The court disagrees with Defendant's interpretation that this requires only a reasonable *belief* at the time of submission of the permit application. (Doc. 139-1 at 15). As whether or not LaGen performed a reasonable inquiry is a question of fact, summary judgment is inappropriate on this issue.

Defendant's second argument here is that the notice of violation from the EPA did not trigger an obligation for LaGen to amend its permit application. It points to LDEQ's decision not to incorporate the allegations into its decision-making process and argues that it would be ridiculous to fault LaGen for not pointing out the very same information LDEQ said it would not consider. The Court disagrees. The fact that LDEQ chose not to treat allegation as fact—which surely would have sources such as LaGen howling with indignation—does not somehow relieve LaGen of its duty under Title V to address all applicable regulations in its permit application.

Defendant's third argument under this heading is that Title V does not create liability for operating with an "inadequate" permit. Plaintiff points to three cases—one of which, *Niagara Mohawk II* is discussed above (p. 24)—that purportedly do allow such liability.

In *Commonwealth of Pennsylvania v. Allegheny Energy, Inc.,* the defendant submitted and operated under Title V permits that did not provide information and implementation plans for pollution controls for prior modifications. 2006 WL 1509061

26

(W.D.Pa. 2006). Defendant claims the court misstated the compliance requirements under Section 502(a). Defendant provides no specifics on how the court misstated the requirements and the Court sees nothing wrong with the *Allegheny* court's statement of the provision. The court found that, because "it is unlawful . . . to violate any requirement of a Title V permit, or to operate a source subject to Title V regulations that is not in compliance with all applicable requirements of a Title V operating permit," plaintiff's claims should not be dismissed. *Id*. at *8.

This view is shared by the district court in *United States v. East Kentucky Power Cooperative*, which also involved a Title V permit issued without PSD applicability based on a prior modification. 498 F. Supp. 2d 1010 (E.D. Ky. 2007). The court, in agreeing with *Allegheny*, holding the language cited immediately above "suggests that the EPA's broad enforcement authority would allow it to bring suit on a Title V permit under the present circumstances." *Id*. at 1017. Defendant seeks to blunt this case by claiming it misinterpreted the Title V discussion for a Title V shield claim. (Doc. 182 at 13). The Court notes that the permit shield argument was in no way the entirety—or even a significant part—of the *East Kentucky* court's discussion.

Defendant is correct that the court in *United States v. Dairyland Power Cooperative* dismissed the Title V claims to the extent that they challenged the submission of incomplete permit applications and the resulting defective permits, which it held can only be challenged through the administrative process outlined in § 7661d of the CAA. However, the court found that plaintiff also alleged conduct in violation of the permit itself, specifically, that the plaintiff "failed to supplement or correct information after it made modifications to its plants." 2010 WL 4294622 at *17-18 (W.D. Wis. 2010).

Case 3:09-cv-00100-JJB -CN   Document 260   12/01/11   Page 27 of 30

Therefore, it allowed the claims to survive dismissal to that extent. The Court adopts this reasoning to the current case in finding that there is a Title V claim for failing to supplement or correct information in Defendant's Title V application, should PSD liability be found.

The Court notes that while the distinction between submitting an incomplete application and the subsequent failure to supplement an application is narrow, it potentially has significant practical ramifications: the remedy for the latter is in district court while the former seems arguably to be through an administrative action.[3] The Court will allow the claim for a Title V violation based on a deficient operating permit. In so deciding, the Court is persuaded by the line of cases cited by Plaintiff and the broad enforcement authority granted to the EPA by the CAA. Also, the Court incorporates its rationale from the PSD discussion above: had LaGen updated its Title V permit to reflect the PSD and BACT applications and then not lived up to it, enforcement would be proper. To then say that enforcement is not proper here for the sole reason LaGen did not supplement its permit application would be to encourage and reward sources for not being forthright in their Title V permit applications. This was clearly not the intent of Congress in crafting the CAA and the Court will therefore not allow it here.

The Court finds Plaintiff has alleged conduct by LaGen that creates liability under Title V for LaGen's alleged failure to identify all applicable requirements in its permit application and for operating with a defective permit to the extent that it is operating a source not in compliance with all applicable requirements of a Title V operating permit.

---

[3] The Court does not read § 7661d to limit EPA's actions to an administrative challenge. Section 7413(2), the broad enforcement provision of the chapter, grants the administrator the right to bring enforcement actions. If Congress had meant to create an exception in situations where § 7661d applied, it could have added language to that effect.

Case 3:09-cv-00100-JJB -CN   Document 260   12/01/11   Page 28 of 30

c) <u>Are the Title V Claims an Impermissible Collateral Attack?</u>

Defendant claims here that Plaintiffs were aware of the alleged deficiencies in its 2005 permit and did not object to the issuance. It points to case law that holds if the EPA does not object during the Title V permitting process, it cannot later bring an enforcement action. Plaintiffs cite other cases that stand for the opposite proposition.

Defendant points out that EPA was aware in 2005 of the 1998/99 work, going so far as to issue a Notice of Violation ("NOV") before the permit was issued. This NOV was forwarded to LDEQ, which issued the permit anyway. Defendant seems to claim that, because EPA did not take the additional step of formally objecting to the issuance, it would be unfair for them to now bring an action for injunction and penalties from that long-ago action.

Plaintiffs counter that such an objection is not a prerequisite to an enforcement action and such a requirement would represent such a curtailment of EPA's powers that Congress would have needed to expressly state it in the CAA. (Doc. 155 at 30).

The Court has reviewed the cases cited by the parties and notes that none appear to be directly on point. While there may be circumstances in which it would be appropriate to bar an enforcement action after EPA failed to object during the permitting process, the Court finds this is not such a situation. Therefore, the Court finds the action is not barred by EPA's failure to formally

Case 3:09-cv-00100-JJB -CN   Document 260   12/01/11   Page 29 of 30

object during the application process.    The Court notes Defendant's contention that this would reward EPA for essentially sitting on its hands while the potential fines mount.  This argument is premature; it is better suited for the penalty phase of this proceeding, if liability is found.  While it might affect the nature and amount of Plaintiff's potential recovery, it should not, under these circumstances, act as a bar on their suit entirely.

Summary judgment on the issue of Title V liability is DENIED.


## Conclusion

For the reasons given above, the Court hereby GRANTS in part and DENIES in part Plaintiffs' Motion (doc. 136) on successor liability and DENIES Defendant's Motions on PSD liability and Title V liability (docs. 138 and 139).

Signed in Baton Rouge, Louisiana, on November 30, 2011.

_____
**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

30