UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA,
Plaintiff,

LOUISIANA DEPARTMENT OF                          CIVIL ACTION
ENVIRONMENTAL QUALITY,
Plaintiff-Intervenor,                            NO. 09-100-JJB-CN

VERSUS

LOUISIANA GENERATING, LLC,
Defendant

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on three Motions for Partial Summary Judgment, two filed by Plaintiffs United States of America and Louisiana Department of Environmental Quality ("Plaintiffs") (docs. 132 and 133) and one by Defendant Louisiana Generating ("LaGen") (doc. 140).  All three of the motions relate to whether the primary reheater replacements done by Cajun Electric qualify as Routine Maintenance, Repair or Replacement ("RMRR"), which would except the work from the Prevention of Significant Deterioration ("PSD") provisions of the Clean Air Act ("CAA").   Parties have briefed the motions, most of which have been filed under seal.  There is no need for oral argument.  For the reasons stated herein, the motions regarding the standard to employ (docs. 133 and 140) are GRANTED in part and DENIED in part and the motion regarding applicability of the exception (doc. 132) is GRANTED.

Gladstein
Dore'
King

## BACKGROUND

A full factual background can be found in an earlier ruling (doc. 260).  The short version is that LaGen bought Big Cajun II ("BCII") in March 2000 out of bankruptcy from Cajun Electric.  Before the sale, Cajun Electric had replaced the primary reheaters in Units 1 and 2 (the "work"), which had been causing these units at the coal-fired electric plant to experience costly shutdowns.  The overarching question of this litigation is whether that work constitutes a major modification to the plant.  If it does, then LaGen—as the successor to Cajun Electric[1]—would be in violation of the PSD program, possibly the Title V operating permit provisions, as well as the Louisiana State Implementation Plan ("Louisiana SIP").  A modification is defined in the CAA only as a physical change that will result in an increase in air pollution.  42 U.S.C. § 7411(a)(4). The parties agree that this is a broad definition.   EPA, recognizing this broad definition, created several exceptions, including the RMRR exception.  LaGen claims that even if the work is considered a modification, it would nonetheless qualify as RMRR and be excepted from PSD and Title V liability.   Though this is a potentially dispositive question, it is Plaintiffs who brought the motion seeking a determination that the exception does not apply to this situation.  As discussed below, LaGen's chief argument is that this determination is not appropriate for summary judgment.

---

[1] In an earlier ruling, the Court held that the theory of successor liability would be available in this case. (Doc. 260).

### 1. The RMRR Exception

The EPA specifically provides that a physical change shall not include "routine maintenance, repair and replacement."  40 C.F.R. § 51.166(b)(2)(iii)(a). The only definition it gives to this term is that it "shall include, but not be limited to, any activity(s) that meets the requirements of the equipment replacement provisions contained in paragraph (y) of this section."  *Id*.  Paragraph (y) includes replacing component parts so long as several conditions are met.  These relate to cost, design and emissions of the replacements.  40 C.F.R. §§ 51.166(y)(1-(3). Although not specifically addressed in other regulations or statutes, there are several EPA-authored documents as well as case law that inform the RMRR discussion.  The parties interpret these documents and cases differently, which leads to the current dispute.

In 1988, EPA made an applicability determination to the Wisconsin Electric Power Company ("WEPCO") addressing the RMRR exception.  (Doc. 133-2). This memorandum was written by Acting Administrator Don Clay ("the Clay Memo").  In the memo, EPA states that the PSD regulations construe the term physical change broadly and the RMRR exception very narrowly.  *Id*. at 4. The following language from the memo has become the touchstone of RMRR analysis:

> In determining whether proposed work at an existing facility is "routine", EPA makes a case-by-case determination by weighing the

3

nature, extent, purpose, frequency, and cost of the work, as well as other relevant factors, to arrive at a common-sense finding.

*Id*.   In the ensuing litigation, the Seventh Circuit adopted this test and it has become the fountainhead of RMRR analysis.   *Wisconsin Electric Power Co., v. Reilly*, 893 F.2d 901 (7th Cir. 1990) ("WEPCO").   These factors, the nature, purpose, frequency, and cost of the work, as well as other relevant factors—with no single factor being dispositive—are known as the WEPCO factors.   The parties agree they govern the determination of whether the work qualifies for the routine maintenance exception.

In 1992, EPA briefly addressed the RMRR exception in the preamble to an amendment to the relevant New Source Review ("NSR") regulations:

> A few commenters requested that EPA define or provide guidance on 'routine repair, replacement, and maintenance' activities. The June 14 proposal did not deal with this aspect of the regulations, nor do the regulatory changes promulgated today. However, the issue has an important bearing on today's rule because a project that is determined to be routine is excluded by EPA regulations from the definition of major modification. For this reason, EPA plans to issue guidance on the subject as part of a NSR regulatory update package which EPA presently intends to propose by early summer. *In the meantime, EPA is today clarifying that the determination of whether the repair or replacement of a particular item of equipment is 'routine' under the NSR regulations, while made on a case-by-case basis, must be based on the evaluation of whether that type of equipment has been repaired or replaced by sources within the relevant industrial category.*

Doc . 157-2 at 14 (emphasis added).   The italicized portion is integral to the discussion of what legal standard to use and will be discussed fully below. It

supports LaGen's argument.  The Court notes that the substance of the amendment in no way addressed RMRR.   There have been several court rulings interpreting these documents—though none from the Fifth Circuit—that the Court will discuss where appropriate.

### 2. The Instant Motions

In their first motion (doc. 132), Plaintiffs seek to have the Court decide as a matter of law that the work does not qualify for the RMRR exception.  LaGen claims this fact-intensive determination is inappropriate for summary judgment as there are numerous disputed facts.  Plaintiffs' second motion (doc. 133) and Defendant's motion (doc. 140) are really cross-motions on the same issue: the standard that should be employed in order to determine whether the work qualifies for the exception—regardless of whether that determination is made now or at trial.  Although this overly simplifies the debate, it is fair to say Plaintiffs argue that a "routine at the unit approach" is appropriate, while LaGen urges a broader "routine in the industry standard."  The Court will address these motions in reverse order.

## Standard of Review

A motion for summary judgment should be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a).  If the dispositive issue is one on which the nonmovant will bear the

burden of proof at trial, the moving party satisfies its burden by pointing out that there is insufficient proof concerning an essential element of the nonmovant's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party meets the initial burden of showing there is no genuine dispute as to material fact, the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a genuine dispute for trial. *Allen v. Rapides Parish Sch. Bd.*, 204 F.3d 619, 621 (5th Cir. 2000).  Doubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party.  *Evans v. City of Bishop*, 238 F.3d 586, 589 (5th Cir. 2000).  In deciding a motion for summary judgment, a court does not weigh the evidence, judge the credibility of witnesses, nor determine the truth of the matter."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).  When deciding whether a dispute over a material fact is genuine, a court decides whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id*. at 248.   This assessment is the same as that in deciding directed verdict at trial: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.

## DISCUSSION

### 1. The Standard for Determining RMRR

As mentioned above, the WEPCO factors will govern whether the routine maintenance exception applies to the work.  These two motions regard the legal

6

standard the Court should employ in making this determination.  Plaintiffs seek to establish three things regarding RMRR: 1) that LaGen bears the burden of proving the work qualifies for the exception; 2) the Court should afford substantial deference to EPA's interpretation of the RMRR exception that it applies only to *de minimis* activities; and 3) that whether a project is routine or not should be decided by looking at other individual operating units, not the business practices of the entire electric generating industry.  (Doc. 145 at 8).  LaGen's motion centers on the standard to employ in determining RMRR.  (Doc. 140-1 at 17).

First, the Court notes the parties seem to have already agreed on the standard to employ in judging RMRR and are simply arguing about certain interpretational matters.  To wit, during the course of briefing these motions, LaGen proposed the following stipulated RMRR standard to Plaintiffs:

> In determining whether the two primary reheater replacement projects at issue in this case constitute routine maintenance, repair and replacement, the trier of fact will consider all of the WEPCO factors, including frequency, taking into consideration the work conducted at the particular unit, the work conducted by others in the industry, and the work conducted at other individual units within the industry.

(Doc. 180-2).  In response, Plaintiffs agreed to this language but apparently insisted on adding more language—much of it is the subject of this motion—that LaGen did not agree to.  (Doc. 180-3).  As the parties agree on the above language—and the Court finds it is reasonable—the Court will adopt it as the standard for assessing RMRR.  The Court will now address Plaintiffs' requested findings.

7

As for who bears the burden of proof regarding the exception, Plaintiffs point to Supreme Court case law that clearly states the party asserting the benefit of a regulatory exclusion bears the burden of proof.  See *N.L.R.B. v. Kentucky River Community Care, Inc*., 532 U.S. 706, 711 (2001).  As LaGen does not address this in its briefs, the Court assumes it agrees and therefore finds the burden of showing the exception applies to the work is on LaGen.

The next issue concerns how much deference to give EPA's interpretation of the exception that it must be narrowly construed.[2]  The parties agree that EPA's longstanding and original interpretation of its own regulations is entitled to substantial deference.  See *Chevron, U.S.A. v. Nat'l Res. Def. Council, Inc.,* 467 U.S. 837 (1984).  LaGen claims that Plaintiffs' current interpretation is different from its original interpretation, however, and therefore should receive no deference at all.   Plaintiffs counter that their position has been consistent throughout.  The Court notes that LaGen is not arguing for a broad interpretation, only that it should be construed no more narrowly here than in the past.  (Doc. 157 at 16).  The Court agrees and finds that, while the exception is indeed to be applied narrowly, Plaintiffs will not be allowed to interpret it more narrowly now than it has in the past.  One example of this is the *Duke IV* case in which the district court rejected EPA's interpretation that RMRR must be viewed "only in light of an individual unit."  *U.S. v. Duke Energy Corp*, 2010 WL 3023517 at *3

---

[2] Plaintiffs use the term "de minimis" in their introduction but not again in their argument.  Even if Plaintiffs seek a de minimis standard, the Court finds they have not properly argued for it.

(M.D. NC 2010).   In the case at bar, Plaintiffs do not offer the same interpretation: they seem to accept that work done across the industry is to be considered but urge for a more weighty consideration of work done at the units in question.

The subject of the fiercest contention is the role of similar work projects in other units in the industry.   This fits most directly into the frequency factor of *WEPCO*, although LaGen argues the industry-wide analysis should apply to all factors.   LaGen frames the issue as whether the frequency of similar projects should be considered across the industry as a whole "routine in the industry" or unit-specific "routine at the unit."   However, the Court can find no reference to "routine at the unit" in any of Plaintiffs' briefs.   Rather, it seems the parties are really arguing over how much weight to give to different types of work.   Plaintiffs use the heart transplant analogy:   while the sheer number of heart transplants might be large, the frequency per patient is very small.   LaGen would like to look at the number of total surgeries while Plaintiffs argue it is the number of patients who have had multiple transplants that matters.   While the Court agrees that both numbers belong in the discussion, it finds the latter is much more relevant to the RMRR determination.

In making this determination, the Court reminds the parties that the overarching principle behind the WEPCO test, as originated in the Clay Memo, is that this is a case-by-case, common-sense finding.   The Court notes that the 1992 preamble clearly states that RMRR analysis "must be based on evaluation

of whether that type of equipment has been repaired or replaced by sources within the relevant industrial category." (Doc. 157-2 at 14). This clearly indicates that work done at other units belongs in the analysis. However, instead of broadening the exception, the Court finds the language limits the analysis of only sources in the relevant category (coal-fired electric generating facilities in this case) would be considered. It does not reduce the analysis to a simple question of "are others doing this work?" as LaGen suggests.

In assessing the purpose, frequency, and cost factors, the Seventh Circuit in *WEPCO* noted that the work involved "would normally occur only once or twice during a unit's expected life cycle . . . Indeed, WEPCO reported" that it had never done such work at any of its other facilities. 893 F.2d 901, 912. The $70 million cost of the project also weighed against a finding of RMRR. *Id*. This is the entirety of the Seventh Circuit's analysis, and, when viewed in context of its otherwise thorough and undoubtedly authoritative opinion, the Court finds that the Seventh Circuit placed a heavy weight on the frequency of a project at the unit in question—that the work was only done once or twice in the unit's lifetime clearly pointed against being routine. This fits with the case-by-case nature of this analysis in which the parties ask how frequently a particular project performed at the unit in question. And while the *WEPCO* work was

"unprecedented" in nature,[3] the Court sees no reason the same analysis should not be employed.  Simple precedent does not equate to routineness.

This is not to say that whether the overall number of reheater replacements is not informative, only that it is less so than the frequency at particular units.  Common sense dictates that, in determining whether the work is routine, it makes sense to look across the industry at similar work on similar units.  However, the Court agrees with the Southern District of Indiana, which found that the overall frequency may only inform the analysis and that "Congress certainly did not intend to allow for companies to make an 'end run' on NSR by allowing the routine maintenance exception to swallow the modification rule." *U.S. v. Southern Indiana Gas and Elec. Co*., 245 F.Supp.2d 994, 1009 (S.D. Ind., 2003).  In short, just because other places may be replacing primary reheaters does not make it routine.  However, if it were to turn out that similar units tend to replace their primary reheaters multiple times during a unit's lifetime, that would argue that such a project is routine, regardless of whether the units in question had this work performed before or not.  To the extent Plaintiffs are arguing that only the frequency at the particular units in question may be examined, the Court disagrees as this would lead to the absurd result of having any first time repair, no matter the scope, be non-routine.

As for the issue of what will be considered the "relevant industrial category," the Court will make that determination based on the evidence

---

[3] Replacing the rear steam drums and air heaters.

presented.   While the Court agrees with Plaintiffs that cyclone replacements would be categorized differently at petroleum and steam plants, it has not been presented with reheaters replacements from different types of plant yet.

In summary, the Court will employ the RMRR standard as stated above (infra. at 7).   Additionally, in evaluating the frequency factor, the Court will give more weight to the frequency of similar work at particular units than it will to the overall number of similar projects across the industry.   The burden will be on LaGen to show it fits the exclusion.   Finally, the exclusion will be interpreted narrowly, but not more narrowly than the EPA has interpreted it in the past.   To the extent the parties are seeking this determination, their motions are granted. To the extent they go beyond this standard, they are denied.


### 2. Summary Judgment on RMRR

Plaintiffs seek summary judgment that the RMRR exception does not apply to the reheater replacements.   LaGen contends this matter is inappropriate for summary judgment as there is a factual dispute as to each of the WEPCO factors.   Specifically, LaGen claims that in a case where there are competing experts giving opinions, such a "battle of the experts" is inappropriate for summary judgment. Plaintiffs argue that, because LaGen's experts are simply offering different conclusions to the same facts, summary judgment is in fact appropriate.  (Doc. 232 at 13).  The Court finds that there is no reason summary judgment cannot be granted in this situation so long as there is no genuine

dispute as to material fact regarding whether the work qualifies for the RMRR exception.  If a "battle of the experts" created a per se rule against summary judgment, then parties would need simply to hire an army of experts—this is something that would further clog the court system and increase the burdens of litigation.  The Court will undertake to analyze the *WEPCO* test and if there is no genuine dispute as to which way the factors point, summary judgment will be appropriate.  The Court will not be weighing evidence or making credibility determinations; it will be determining whether a reasonable jury could find the RMRR exception applies to the work in question.  In order to win, either side would have to have all of the factors point indisputably toward it such that a reasonable jury could not find for the other party. The Court notes that this is a common sense test and that common sense must dictate the application of each factor.

### Nature

In discussing this factor, LaGen directs to the Court first to its expert Mr. Golden, whose analysis begins with a dictionary definition of "routine."  He focuses on the procedural aspect of this definition and then finds that, because Cajun Electric followed both company protocol and general industry practice before doing the work, it is therefore routine.  (Docs. 158-2 at 17; 134-6).  The Court agrees with the Plaintiffs that under this rubric, all projects that are properly and extensively planned would be routine.  In fact, the Court finds that the degree

of planning belies a finding of routineness—common sense dictates that when you do something routine you do not need extensive planning and approval.

The parties disagree about whether Cajun Electric's capitalization of the work should be considered in this analysis.  LaGen's expert Mr. Barrett contends it should not.  Plaintiffs argue that either it should or, by Mr. Barrett's logic, his entire report should not be considered in this discussion.  The Court finds that Mr. Barrett does not create a genuine dispute as to a material fact because he is only arguing what relevance—if any—the accounting treatment should receive. The Court agrees with the *Ohio Edison* court in finding that accounting treatment is highly probative in the RMRR analysis.  *United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 860 (S.D. Ohio 2003).  In particular, the Court agrees with the *Ohio Edison* court's conclusion that "a straightforward and logical construction of the term 'maintenance,' let alone 'routine maintenance,' would exclude from its scope any amounts defined as capital expenditures."  *Id*.

LaGen also points to the LDEQ determination that the earlier steam turbine projects performed by Cajun Electric did qualify as RMRR as direct evidence that Cajun Electric thought the work at issue would also qualify for the exception. (Doc. 158-2 at 27). However, the Court agrees with Plaintiffs that the documentation surrounding the 1998/99 work is far more relevant to the RMRR analysis.  These documents do not refer at all to the earlier steam turbine work and indicate no reliance on the earlier RMRR exception decision by LDEQ.

14

Rather, they indicate that the nature of the project was not routine maintenance but rather an improvement to the facility to increase generation.

The Court finds that the nature of the work could not but weigh in favor of Plaintiffs and that a reasonable jury could not find otherwise.

**Extent**

This factor is similar to the nature factor discussed above.  Essentially, the issue here is the size and scope of the project.  LaGen contends that the work needs to be studied in the context of the industry.  It points out that the work was done in 25 days per unit, which Mr. Golden calls a short to medium period of time within the industry.  (Doc. 158-2 at 28-29).  LaGen makes much of the fact that Cajun Electric directed bidders that the work was not to change the thermal performance of the reheater and that the new reheaters were to function in the same way.  *Id.* at 29.  Finally, LaGen argues that the fact that Cajun Electric's bankruptcy trustee sought approval from potential buyers before signing off on the project speaks only to the timing—and not the size—of the projects.

The government counters that the extensive preparation, time, and process used to replace the reheaters points indisputably towards a finding of non-routineness.  (Doc. 232 at 22-24).  Additionally, Plaintiffs point out that the work at issue contrasts with Cajun Electric's own work order system, which included projects under $50,000 and was referred to inside the company as "routine maintenance."  (Docs. 234 at 23, 134-10 at 20-25).

The Court finds there is no genuine dispute about this factor and that a reasonable jury would not be able to conclude other than that this factor weighs in favor non-routineness.  The work took some 25 days per unit, required a rail and pulley system in order to remove the old tubing, and was done by some 175 boilermakers employed by the contractor doing the work.  Everything about this fairly screams that it was an extensive project.  Therefore, a reasonable jury could not find that it was routine.

**Purpose**

The RMRR exception is to apply to "regular, customary, or standard undertaking[s] for the purpose of maintaining the plant in its present condition." (Doc. 133-2 at 3-4).  Another way of saying this is that the exception is to apply to work done in order to preserve the status quo at a unit.  Plaintiffs point to evidence that Cajun Electric acknowledged the projects were undertaken to "significantly reduce the number of forced outages" caused by reheater tube failures.  (Doc. 144 at 21).  LaGen counters that its expert, Mr. Golden, finds the purpose of maintenance activities "is to maintain the highest practical availability and reliability of generating assets".  (Doc. 158-2 at 31).  This is clearly different from the Clay memo and the Court does not understand how he arrived at this opinion and why it should be given any weight.

The number or outages had been increasing over the years leading to the work.  The work was done to lessen the number, not to cause the number of outages to plateau.  This meant the unit would be better than its present

16

condition.   Therefore, this type of work is beyond the purpose of the RMRR exception.   Nothing in the statements cited by LaGen changes this:   in the WEPCO rule preamble, EPA states it is not discouraging changes that increase efficiency, etc.  The Court would be shocked if the opposite were true.  However, this does not mean EPA intended to expand the RMRR exception.

Reducing forced outages equates with better performance.   As for the conclusions of Mr. Golden, the Court agrees with Plaintiffs (doc. 232 at 25) that his analysis does nothing to distinguish routine from non-routine work—under his analysis it is difficult to imagine what sort of work—short of building a new unit—would *not* qualify as RMRR.   Simply presenting a contrary opinion does not create a genuine dispute that the purpose of the work—to decrease forced outages at BCI and II—is beyond the scope considered by the RMRR exception. This factor weighs inarguably against applying the exception.

### Frequency

As discussed above, in considering this factor, the Court will examine both the number of reheater replacements across the industry and pay particular attention to the number of units that have replaced primary reheaters more than once.   Much of the argument in relation to this factor revolves around what should be considered similar projects.   LaGen's expert Mr. Golden's analysis indicates that there have been 434 projects replacing all or significant portions of reheaters at the nation's 574 units in the industry.  (Doc. 134-6 at 55).   Plaintiffs claim this data field is far too broad in that it looks at projects costing $100,000 or

more.  (Doc. 232 at 26-28).  The correct set of data, Plaintiffs argue, consists of pre-1998 reheater-only work costing $4.5 million or more.  According to Plaintiffs, the number of similar projects under this rubric is 18.  *Id*. at 28.  When taking non-exclusive reheater work into consideration, the number of similar projects is 79.  (Doc. 134-10 at 176-78 and Golden errata at 2).

The Court agrees with Plaintiffs that when assessing frequency, the similar projects across the industry must the same size and scope as the work at issue. As this work was exclusively done on the primary reheaters and cost approximately $4.5 million, the Court finds that only projects relating to primary reheaters and costing a similar amount are relevant.  The fact that EPA has used a $100,000 threshold for other analysis of projects does not mean that this is a magic number for similarity.  As for the time period, the Court finds that only pre-1998 projects are relevant.  This entire case is about what Cajun Electric knew or should have reasonably known before it commenced the work.  Therefore, the routineness of the work must be evaluated from when it began the work, 1998. The Court finds that, even using Mr. Golden's larger 79 similar project number, there is no genuine dispute about which side this factor favors.  Seventy-nine— much less 18—similar projects between 1972 and 1998 at 574 units does not indicate a routine procedure.  No reasonable jury could find otherwise.  Further, the fact that LaGen has pointed to no projects where a single unit has performed multiple reheater replacements further indicates this is not a frequently performed procedure.

**Cost**

The cost of each reheater project was approximately $4.5 million.  (Doc. 144-1 at 8).  At the time they were undertaken, these were the most costly projects Cajun Electric had ever undertaken at these units. *Id*.  This is all the Court needs to find that no reasonable jury could find that this factor does not weigh in favor of Plaintiffs.  Despite Mr. Golden's analysis to the contrary, the Court finds common sense requires this conclusion. The facts are clear and simple and lead to an undeniable conclusion: Four and a half million dollars is a lot of money.  It was the most money Cajun Electric had ever spent on these particular units.  How can this point to a routine activity?  It cannot. LaGen's assertion that the cost of the projects in terms of kilowatt hours is particularly revealing.  (Doc. 158-2 at 42).  The Court disagrees.  None of the relevant cases or documents suggest that this is in some way important.  Further, to the extent LaGen is arguing that any project costing less than $114 million—half of the replacement cost for an entire boiler[4]—is routine, the Court finds this would be an exception that swallows the rule and in no way fits with the narrow nature of the exception.

The Court finds there is no genuine dispute as to a material fact and the cost factor indisputably points to a finding of non-routine work.

In summary, the Court finds that applying the *WEPCO* factors in a common-sense fashion, no reasonable jury could find that the reheater

---

[4] According to Mr. Golden's report.  See Doc. 134-6 at 54). September 18, 2012.

replacement projects qualify for the RMRR exception.  Common sense dictates that when a generating facility takes 25 days and spends $4.5 million—the largest amount ever spent on the unit—with the intent to decrease forced outages and therefore increase future generation, this work cannot in any way be considered routine.  A finding to the contrary would essentially allow what was intended to be a narrow exception to swallow the entire PSD program.   As no reasonable jury could find that analysis of the WEPCO factors points to a common-sense finding of routineness, the motion for summary judgment is GRANTED.

## CONCLUSION

To the extent they correspond with the reasons stated herein, the motions on the standard to be employed by the Court in assessing RMRR (docs. 133 and 140) are GRANTED in part and DENIED in part. Plaintiffs' motion for summary judgment on the applicability of the RMRR exception (doc. 132) is GRANTED. Further, when the parties refer to attachments, exhibits, or evidence of any sort in future filings, they are to point to a specific docket entry where the document can be found.[5]

---

[5] In a case notable for the truly excellent lawyering on both sides, there is one point of frustration for the Court: it spends almost as much time finding documents as it does reading them.  It would greatly aid the Court if each document was cited to by docket entry as well as the attachment number assigned it by the clerk of court.  The exact form of the citation is not important; the Court simply wants to know where to find the document being discussed.  That being said, the Court will say again how impressed it is not only with the quality of the legal work being done on both sides but also by the professionalism with which the attorneys conduct themselves.

Signed in Baton Rouge, Louisiana, on September 18, 2012.

**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**